WIRAMAL CORPORATION, PETITIONER-APPELLANT, v. DIRECTOR OF DIVISION OF TAXATION, DEFENDANT-RESPONDENT.

Argued October 10, 1961—Decided November 20, 1961.

202

Mr. *Spencer Pinkham,* of the New York Bar, argued the cause for petitioner-appellant (*Mr. Irving Friedman,* attorney; *Mr. David J. Collon,* of the New York Bar, of counsel).

Mr. *Alan B. Handler,* Deputy Attorney General, argued the cause for defendant-respondent (*Mr. David D. Furman,* Attorney General of New Jersey, attorney; *Mr. Handler,* of counsel).

The opinion of the court was delivered by

SCHETTINO, J. Appeal was taken to the Appellate Division from the determinations of the Division of Tax Appeals of the Department of the Treasury of the State of New Jersey, affirming assessments of additional franchise taxes for the years 1955 and 1956. The petitioner was found not to be an investment company entitled to preferential tax treatment under *N. J. S. A.* 54:10A–5(d). Before argument in the Appellate Division, we certified the appeal on our own motion.

The opinion of the Division of Tax Appeals, delivered by Commissioner Kopp, is adopted by this court and we shall hereafter discuss the constitutional point not disposed of therein.

## I.

The opinion reads as follows:

"Petitioner, a Delaware corporation authorized to do business in the State of New Jersey, seeks to set aside two determinations of the Director of the Division of Taxation assessing additional franchise taxes against it for the tax years 1955 and 1956 under *N. J. S. A.* 54:10A–1 *et seq.*

The parties entered into a written stipulation of facts which clearly established that petitioner qualified as an investment company except for its ownership of 30% of the outstanding stock of Salt Creek Development Corporation, an Ohio corporation. The factual situation with respect to the Salt Creek stock was the subject of testimony and exhibits received at the hearing before me on November 10, 1960.

Petitioner called John J. Phelan as its witness and he testified that he was a director and the secretary of Wiramal Corporation; that W. C. Fitkin was a director and the president of said corporation; that in 1951 Fitkin was indebted to petitioner in the sum of $35,000; that Fitkin agreed to assign his interest in Salt Creek Development Corporation to petitioner for the sum of $45,000 and some odd dollars, and as a next step, repay the corporation (petitioner) the $35,000 that he owed it; that Fitkin retained the right to vote the Salt Creek stock as consideration for indemnifying petitioner against any subsequent loss.

The witness then read into the record three letters which he testified contained the entire understanding between petitioner and Fitkin relative to the Salt Creek stock.

The first letter from petitioner to Fitkin, dated August 5, 1951, is as follows:

'Dear Mr. Fitkin:

This letter confirms purchase from you of 300 shares of Salt Creek Development Corporation capital stock for the sum of $45,149.25.

This sale has been consummated with you on the basis that you agree in writing to indemnify the corporation against loss upon disposition of this security at any time within our discretion.

Upon receipt of your written acknowledgement of indemnification, we will agree that you will maintain the sole voting rights carried by this stock in any manner in which you desire.

Very truly yours,<br>Wiramal Corporation<br>J. J. Phelan, Secretary'

The second letter was from Fitkin to petitioner dated August 5, 1951 and is as follows:

'Wiramal Corporation
18 Corlies Avenue
Allenhurst, New Jersey

Gentlemen:

This is to confirm the understanding as outlined in your letter of this date, wherein I agree to indemnify you against any loss upon the disposition or liquidation of 300 shares of Salt Creek Development Corporation capital stock which you have purchased from me at an appraised value of $45,149.25.

This also confirms our agreement which provides that in consideration of my indemnification, I will have the sole right to vote the stock at any time in any manner which I deem desirable.

Very truly yours,<br>W. C. Fitkin'

The third letter from petitioner to Fitkin dated August 6, 1951, was as follows:

'Dear Sir:

In connection with the purchase from you of 300 shares of stock of Salt Creek Development Corporation, it is understood that you shall retain all voting rights of said shares, and that at your request we will deliver to you proxies to vote the same.

You further agree to indemnify us against any loss we may sustain on the sale of this stock or on the liquidation of Salt Creek Development Corporation.

Very truly yours,<br>Wiramal Corporation<br>J. J. Phelan'

The witness then testified that Fitkin transferred the stock certificates to petitioner and the stock transfer book of Salt Creek Development Corporation thereafter showed petitioner as the owner of the stock; that the Salt Creek Development Corporation was dissolved on September 30, 1955 and petitioner surrendered its stock therein and that on October 1, 1955 petitioner entered into a partnership agreement with the other stockholders of Salt Creek Development Corporation.

This partnership agreement was admitted in evidence as Exhibit P-1 for the sole purpose of establishing the fact that petitioner was the holder of 300 shares of stock of Salt Creek on September 30, 1955, the date when the corporation was dissolved, that petitioner's interest in Salt Creek was transferred to the partnership and that the partnership interest was 30% which was equal to the percentage of its former interest in Salt Creek.

Considered together, the stipulation of facts, testimony and exhibits received at the hearing establish, beyond question, that the petitioner, Wiramal Corporation, from August, 1951 to September 30, 1955, was the owner of 300 shares out of an issue of 1000 shares of the capital stock of Salt Creek Development Corporation, which 1000 shares represented the total stock of all classes issued and outstanding of Salt Creek Development Corporation.

The Director of the Division of Taxation has declined to accord the petitioner the status of an 'investment company' under *N. J. S. A.* 54:10A-4(f) for the tax years 1955 and 1956 on the ground that petitioner does not meet the definition of an 'investment company' as therein provided because of its ownership of the Salt Creek stock. The pertinent part of the definition is as follows:

'(f) "Investment company" shall mean any corporation whose business during the period *covered by its report* consisted, to the extent of at least 90% thereof of holding, investing and reinvesting in stocks, bonds, notes, mortgages, debentures, patents, patent rights and other securities for its own account, *but this shall not include any corporation which:*  *  *  *  (3) owned more than 10% of either the aggregate outstanding shares of capital stock of all classes entitled to vote, or of the aggregate outstanding shares of non-voting capital stock, of any other corporation, *during the period covered by its report.'* (Emphasis added)

It should be noted that the periods covered by the reports under consideration in this case are the calendar years 1954 and 1955.

Petitioner contends that it is entitled to be taxed as an 'investment company' and urges four points in support thereof.

■ The first point that petitioner argues is that a proper interpretation of the definition of an 'investment company' as provided in *N. J. S. A.* 54:10A-4(f) is that 'if a corporation has its funds invested in stocks, bonds or other securities aggregating not less than 90% of its assets at cost or market value, and no one of these investments represents stock of another corporation in excess of 10%

of the outstanding stock of such other corporation, and if no less than 90% of the activities of the tax-paying corporation and no less than 90% of its gross income is derived from the ownership or holding of such stocks, bonds or other securities, the taxpaying corporation is entitled to the special treatment as an Investment Company, entitled to use a tax basis of 25% of its net worth. It does not and should not matter what investments or properties are represented by the remaining 10% or less of the assets, activities or gross income of the tax-paying corporation.

The plain answer to this argument of petitioner is that *N. J. S. A.* 54:10A–4(f) is clear and unambiguous in its language and does not require any interpretation beyond reading it and according it the ordinary and well understood meaning of the words. Contrary to petitioner's interpretation the statute says:

> 'Investment company' shall mean any corporation whose business consisted, [etc.] * * *, *but this shall not include any corporation which * * *.*'

Obviously no corporation, no matter of what its business consists, can be an 'investment company' if it did any one of the next three enumerated acts, and the third one of these provisions is:

> '(3) owned more than 10% * * * of capital stock * * * of any other corporation, during the period covered by its report.'

We find, therefore, no merit to petitioner's first contention.

The second contention of petitioner is that if *N. J. S. A.* 54:10A–4(f) (3) excludes petitioner from qualification as an investment company because of its ownership of the Salt Creek stock, it is unconstitutional under the Constitution of the United States and the State of New Jersey.

It has been uniformly held by the Division of Tax Appeals and by its predecessor body, the State Board of Tax Appeals, that it has no power to pass upon the constitutionality of an act of the Legislature, but must interpret the statutes as they are written. For that reason no consideration is given to the second contention of petitioner.

■ The third contention of petitioner is that it held the Salt Creek stock as security for a debt and was not an investment in the capital stock of another corporation.

The evidence adduced by petitioner itself conclusively established that petitioner was the owner of the Salt Creek stock. The contents of the letters set forth in full earlier in this opinion conclude a sale and purchase of the stock. They contain no indication of an hypothecation of the stock. True, if petitioner lost money by the transfer, the debtor had to pay the deficiency to petitioner, but the contrary situation was not so treated. If petitioner realized a profit by the transfer, it was not to return it to the debtor. Nor was there any provision permitting the debtor to obtain the return of his stock

upon payment of the debt. In fact, there is not a scintilla of evidence to support this contention of petitioner.

The fourth contention of petitioner is that it is not disqualified as an investment company for the tax year 1956 because it did not own the Salt Creek stock for the entire calendar year 1955.

It was established that in view of the dissolution of Salt Creek Development Corporation on September 30, 1955 petitioner between that date and December 31, 1955 did not own 10% of the capital stock of any other corporation.

Petitioner argues that the language in Section 54:10A–4 'during the period covered by its report "means" the entire period covered by its report.' It seeks to support this interpretation by pointing to N. J. S. A. 54:10A–9 which contains the words 'during all or part of any year' and argued therefrom that if the Legislature intended the words here being considered to mean 'all or part of the period' it could easily have written these additional words. And so it could have, but by the same reasoning, if the Legislature intended that the ownership should continue during the entire year, it could have easily added the word 'entire.'

Petitioner cites in its brief numerous cases construing the word 'period.' The significance of these cases is that the words 'period covered by its report' mean the full time or, in other words, the full period from January 1 to December 31. Of course, that is the very meaning of those words. To assert that, however, is not to say that the ownership of the stock had to continue for that period. On the contrary the ownership had only to occur *during* that period.

Concededly, the use of the word 'during' in a statute is usually rather unfortunate. It lacks definity. It is capable of two meanings. *Webster's Unabridged Dictionary* gives its meaning as, 'In or throughout the time or existence of,' and further gives as example 'He came during the day; it continued during the whole hour.' *Funk & Wagnalls' Practical Standard Dictionary* defines 'during' as 'In or within the time of.'

According the words 'during the period covered by its report' the ordinary meaning when applied to an act of ownership of stock, it seems reasonable to conclude that if the ownership existed in the period, regardless of the length of time such ownership continued, the status of an investment company could not be granted to the taxpayer. Such a construction gives to each word in the phrase its full ordinary meaning without the need to add any other words thereto. To construe those words to mean that the ownership must exist on each day of the entire period covered by the report requires the addition of at least the word 'entire' to the phrase. Such a construction appears to be unwarranted by the language used and it cannot, therefore, be adopted.

For the foregoing reasons the petitions of appeal filed herein are dismissed."

## II.

We now consider petitioner's attack on the constitutionality of the statute. Wiramal asserts that the Corporation Business Tax Act, *L.* 1945, *c.* 162, *N. J. S. A.* 54:10A-1 *et seq.,* violates the limitations placed on private, special or local laws in *Article* IV, *Section* 7, *Paragraph* 9 (6) of the 1947 *New Jersey Constitution* and the equal protection clause in the Fourteenth Amendment of the *Federal Constitution.* It contends that the definition of an "investment company" is arbitrary and discriminatory in that it excludes any corporation, which otherwise would qualify for preferential tax treatment under *L.* 1945, *c.* 162, § 5, *N. J. S. A.* 54:10A-5(d), whenever such corporation:

"owned more than 10% of either the aggregate outstanding shares of capital stock of all classes entitled to vote, or of the aggregate outstanding shares of nonvoting capital stock, of any other corporation, during the period covered by its report." *L.* 1947, *c.* 50, § 1; *N. J. S. A.* 54:10A-4(f)(3).

By way of illustration it points out that a corporation otherwise qualified to receive preferential treatment would destroy its status as an investment company merely by investing a small sum in 10.1% of the voting or nonvoting stock of another corporation. On the other hand, such corporate taxpayer could retain investment company status, even though it invested a large percentage of its gross assets in the stock of a large corporation, so long as no more than 10% of either the aggregate outstanding shares of all classes entitled to vote or the nonvoting stock in that corporation was purchased. Thus an investment company could own 10% of an issuer's voting stock and 10% of its nonvoting stock, or a total of 20% [10%] of the issuer's outstanding stock and still be within the definition of an "investment company" though millions of dollars might be involved. Before considering this argument, we shall first refer to the applicable principles of law.

Under the Federal and State Constitutions (except in relation to *ad valorem* taxation under *Art.* VIII, § 1, *par.* 1 of the *New Jersey Constitution*) the Legislature has a wide discretion in formulating tax laws as well as tax exemptions, *General Electric Co. v. Passaic,* 28 *N. J.* 499 (1958); and its power to classify for purposes of taxation permits appropriate "flexibility and variety." *Allied Stores of Ohio v. Bowers,* 358 *U. S.* 522, 526, 79 *S. Ct.* 437, 3 *L. Ed. 2d* 480, 484 (1959). It is true that a classification may not be arbitrary and must be based on a real difference having a fair and substantial relation to the object of the legislation. *Southern R. Co. v. Greene,* 216 *U. S.* 400, 417, 30 *S. Ct.* 287, 54 *L. Ed.* 536, 541 (1910); *F. S. Royster Guano Co. v. Commonwealth of Virginia,* 253 *U. S.* 412, 415, 40 *S. Ct.* 560, 64 *L. Ed.* 987, 990 (1920); *Quaker City Cab Co. v. Pennsylvania,* 277 *U. S.* 389, 400, 48 *S. Ct.* 553, 72 *L. Ed.* 927, 929 (1928); *Lane Distributors, Inc. v. Tilton,* 7 *N. J.* 349, 362 (1951). But the burden of proof is on him who asserts an unjust and illegal discrimination. *Ring v. North Arlington,* 136 *N. J. L.* 494, 498 (*Sup. Ct.* 1948), affirmed on opinion below, 1 *N. J.* 24 (1948).

Fundamental differences between taxpayers and between the subjects of taxation and those exempted have been held sufficient to support a classification for tax purposes. Thus, it has been held that a sufficient difference for *ad valorem* tax purposes exists between banks which make loans mainly from money of depositors and those financial institutions which make loans mainly from money supplied otherwise than by deposits, *First National Bank of Shreveport v. Louisiana Tax Commission,* 289 *U. S.* 60, 64, 53 *S. Ct.* 511, 77 *L. Ed.* 1030, 1034 (1933); and between telephone companies run by cooperative groups and other telephone companies. *Citizens Telephone Co. v. Fuller,* 229 *U. S.* 322, 33 *S. Ct.* 833, 57 *L. Ed.* 1206 (1913). For purposes of a license tax there is a sufficient difference between domestic life insurance companies and fraternal societies which in-

sure the lives of their members. *Northwestern Mutual Ins. Co. v. Wisconsin,* 247 *U. S.* 132, 38 *S. Ct.* 444, 62 *L. Ed.* 1025 (1918). Furthermore, a valid distinction exists for gross receipts tax purposes between public utilities and other corporations, *New York Rapid Transit Corp. v. City of New York,* 303 *U. S.* 573, 58 *S. Ct.* 721, 82 *L. Ed.* 1024 (1938); and for different succession tax rates on persons varying in degrees of relationship to a testator. *Magoun v. Illinois Trust & Savings Bank,* 170 *U. S.* 283, 18 *S. Ct.* 594, 42 *L. Ed.* 1037 (1898).

█ Petitioner's argument accepts the fact that companies performing different functions may be taxed at different rates, for it seeks the benefit of the statutory distinction between investment companies and other corporations. What petitioner overlooks, however, is that there may be an equally important distinction between an "investment company" as defined in the statute and a corporation which gains control of other corporations by investing in large blocks of the latter's securities. The Legislature may seek to discourage a certain type of business or activity and foster others. *Allied Stores of Ohio, supra,* 358 *U. S.,* at p. 528, 79 *S. Ct.,* at p. 441, 3 *L. Ed.* 2d, at p. 485; *American Sugar Ref. Co. v. Louisiana,* 179 *U. S.* 89, 21 *S. Ct.* 43, 45 *L. Ed.* 102 (1900); *General Electric Co. v. Passaic, supra,* 28 *N. J.,* at p. 509; *N. J. Rest. Ass'n. v. Holderman,* 24 *N. J.* 295, 301 (1957); *State v. Garden State Racing Ass'n.,* 136 *N. J. L.* 173, 180 (*E. & A.* 1947); *Schwartz v. Essex County Board of Taxation,* 129 *N. J. L.* 129, 134 (1942), affirmed 130 *N. J. L.* 177 (*E. & A.* 1943).

█ It is clear then, as Justice Bradley stated in his often quoted *dictum,* that no iron rule of equality is applied. *Bell's Gap Railroad Co. v. Pennsylvania,* 134 *U. S.* 232, 10 *S. Ct.* 533, 33 *L. Ed.* 892, 895 (1890). And rightly so, for there cannot be an exact exclusion or inclusion of persons and things in classification for governmental purposes. *Magoun, supra,* 170 *U. S.,* at p. 296, 18 *S. Ct.,* at p. 599, 42 *L. Ed.,* at p. 1043. If the Legislature were

compelled to eliminate every inequality, no matter how small, effective legislative process would be intolerably fettered. *Ohio Oil Co. v. Conway,* 281 *U. S.* 146, 159, 50 *S. Ct.* 310, 74 *L. Ed.* 775, 782 (1930). As long as the benefits or burdens bear alike upon all within the class and "the classification can be justified upon any reasonable theory," the classification must be upheld. *State v. Garden State Racing Ass'n., supra,* 136 *N. J. L.,* at *p.* 178. On this basis laws were upheld which taxed steam laundries but not others, *Quong Wing v. Kirkendall,* 223 *U. S.* 59, 32 *S. Ct.* 192, 56 *L. Ed.* 350 (1912); oleomargarine but not butter, *A. Magnano Co. v. Hamilton,* 292 *U. S.* 40, 54 *S. Ct.* 599, 78 *L. Ed.* 1109 (1934); and anthracite but not bituminous coal, *Heisler v. Thomas Colliery Co.,* 260 *U. S.* 245, 43 *S. Ct.* 83, 67 *L. Ed.* 237 (1922). A law which taxed certain income to racetracks in business for more than two years, but not others, was also upheld. *State v. Garden State Racing Ass'n., supra,* 136 *N. J. L.,* at *p.* 178.

■ In light of these general principles petitioner's illustration loses significance unless the only purpose behind the pertinent statutory provisions was to raise revenue by taxing investment companies. However, we find that there were additional legislative motives. When defining the status of an investment company, the Legislature drew a line beyond which it may have felt such a corporation would assume undesirable characteristics. As originally enacted, the Corporation Business Tax Act gave preferential treatment to investment companies which were both regulated under the Investment Company Act of 1940, 15 *U. S. C. A.* § 80a–1 *et seq.,* and also taxed under Supplement Q of the Internal Revenue Code of 1939, 26 *U. S. C. A.* § 361 *et seq., L.* 1945, c. 162, §§ 4 and 5 (*N. J. S. A.* 54:10A–4, 5). Although we find no contemporary legislative history expressing the purpose for including these requirements, the Legislature was undoubtedly aware of the policy declaration expressly set forth in the Investment Company Act

of 1940. That declaration states, *inter alia,* that investment companies are affected with a public interest in that they could "dominate and control or otherwise affect the policies and management" of other corporations and should therefore be regulated. 15 *U. S. C. A.* § 80a–1(a). We further note that the New Jersey Commission on State Tax Policy in its *Second Report,* at *pages* 102–3 (March 24, 1947), stated:

"The original legislation in 1945 provided for special treatment of regulated investment companies, that is, companies subject to Federal regulation under the Investment Companies Act of 1940, provided such companies had elected to come under the provisions of Supplement Q of the Internal Revenue Code. This special treatment was made on the meritorious ground that the particular type of company involved provided an investment medium for the small investor and was subject to public supervision, as distinguished from other investment companies. It has since been urged upon the Commission that the requirement of submission to Supplement Q makes an unfair discrimination against regulated investment companies which are also subject to public supervision but which have not for one reason or another elected to come under Supplement Q.

The merits of the case presented by regulated investment companies are somewhat related to the question of expediency in the taxation of all investment companies, including the so-called personal holding companies. This type of business normally desires to center its activities in the New York financial market, and the principal office of such a business may readily be moved from Jersey City to New York City, and vice versa. Most of the large taxpayers, or potential taxpayers, are Delaware corporations and their only activity usually is represented by the maintenance of a small office and staff, provision for receipt and delivery of securities, and maintenance of bank deposits and other types of banking business, a type of business which is concentrated among the banks located in Jersey City. To the extent that our tax law creates a tax liability equal to or in excess of that in New York, this type of company and financial business it brings to New Jersey tends to move out of the State."

Experience proved that a number of investment companies which did not fall within the statutory definition moved out of the state. This problem was studied by the Commission on State Tax Policy which thereafter recommended preferential treatment to a wider group of such companies. However, the Commission cautioned that in

broadening the group entitled to preferential tax treatment, the Legislature should formulate "a careful definition of investment companies to exclude the great holding corporations." *Second Report, supra, p.* 104. Less than one month after that report was issued the Legislature amended the definition in *N. J. S. A.* 54:10A–4(f) to its present form, thereby eliminating the requirement of federal regulation. *L.* 1947, *c.* 50, § 1. Evidence that the amended definition was drafted to exclude companies capable of dominating and controlling others is found in a preface statement which accompanied the bill to the Assembly. It reads:

"This bill incorporates the several changes in the Corporation Business Tax Act (1945) recommended in the Second Report of the Commission on State Tax Policy." *Assembly Bill* 464 (March 24, 1947).

The Legislature further emphasized its intent to grant preferential treatment to investment companies where there is assurance against the evils of control by later restoring to preferred status those companies regulated under the Investment Company Act of 1940, without subjecting them to the 10% limitations required of unregulated companies. *L.* 1948, *c.* 459, § 1, *N. J. S. A.* 54:10A–4(g).

■■ Thus in order to induce investment companies to remain in our State, the definition of such companies entitled to preferential tax treatment was broadened. But at the same time the Legislature carefully worded the definition to insure that, in the absence of the federal protections, the evils of pyramiding and undue control of other corporations would nevertheless be discouraged. The inclusion of a qualification requirement that an investment company may own no more than ten percent of the voting stock or ten percent of the nonvoting stock of any one issuer bears a reasonable relation to that purpose. As we have declared when dealing with the constitutional validity of legislative classifications in other fields, it is not enough

to say that another classification might serve equally as well. *Two Guys from Harrison v. Furman,* 32 *N. J.* 199, 218 (1960); *N. J. Restaurant Ass'n Inc. v. Holderman,* 24 *N. J.* 295, 300 (1957).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL and SCHETTINO—5.

*For reversal*—None.