LOCKWOOD *v*. COMMISSIONER OF REVENUE.

1. TAXATION—CONSTRUCTION OF STATUTES—USE TAXES—AMEND-
MENT.

Statute, amending the use tax act and providing for the levy
and collection of a 1% tax upon use of tangible personal
property to be collected by the seller in addition to a 3% sales
tax, is construed as exceeding the 3% limitation upon sales
taxes set forth in the present sales tax diversion amendment
to the Constitution (Const 1908, art 10, § 23, as amended in
1954; CL 1948, §§ 205.93, 205.95–205.97, as amended by PA
1959, No 263).

2. EVIDENCE—JUDICIAL NOTICE.

The Supreme Court takes judicial notice of what every citizen
of the State knows from his daily life.

3. CONSTITUTIONAL LAW—CONSTRUCTION OF SALES TAX DIVERSION
AMENDMENT.

The presently effective sales tax diversion amendment to the
Constitution is construed to accomplish its manifest objective
and intent to limit the rate of taxation on the retail sale of
tangible personal property (Const 1908, art 10, § 23, as amend-
ed in 1954).

4. SAME—CONSTRUCTION BY COURTS.

Courts must construe provisions of the Constitution to arrive at
that meaning which accomplishes the manifest objective in-
tended by the people, as determined from judicial notice taken
of common experience in daily life.

REFERENCES FOR POINTS IN HEADNOTES

[1, 3]  47 Am Jur, Sales and Use Taxes §§ 14, 54.
Constitutionality, construction, and application of general use
tax or other compensating tax designed to complement state
sales tax.   129 ALR 222, 153 ALR 609.
[2]  20 Am Jur, Evidence § 18.
[4]  11 Am Jur, Constitutional Law § 61.
[5]  11 Am Jur, Constitutional Law § 57.
[7]  11 Am Jur, Constitutional Law § 129.
[8]  47 Am Jur, Sales and Use Taxes § 15.
[10]  14 Am Jur, Costs § 37.

5. Same—Construction.

A constitutional limitation must be construed to effectuate, not to abolish, the protection sought by it to be afforded.

6. Same—Construction.

The people have a right to have the limitations in a State Constitution respected and given the fair and legitimate force which its terms require.

7. Same—Presumptions—Statutes.

The presumption of constitutionality accorded to acts of the legislature cannot prevail, where the statute is prohibited by the express language of the Constitution or by necessary implication.

8. Taxation—Use Taxes—Sales Taxes—Constitutional Law.

Provisions of act, amending the use tax act, whereby an additional 1% specific tax is levied upon transactions occurring within this State, that is measured by the same price paid for the article as the 3% sales tax, and is paid at the same time, and whereby the tax burden of the consumer of tangible personal property is intended to be increased *held*, unconstitutional as violative of provision of Constitution limiting sales tax to 3% (Const 1908, art 10, § 23, as amended in 1954; CL 1948, §§ 205.93, 205.95-205.97, as amended by PA 1959, No 263).

9. Courts—Construction of Opinion.

The language of a court's opinion is to be read, and interpreted, in the light of the facts the court faced when it employed the language in question.

10. Costs—Public Question—Use Tax.

No costs are allowed in mandamus proceeding to declare act amending the use tax act void, a public question being involved (CL 1948, §§ 205.93, 205.95-205.97, as amended by PA 1959, No 263).

Dethmers, C.J., and Carr and Kelly, JJ., dissenting.

Original mandamus by Charles C. Lockwood and Charles P. Lockwood seeking to restrain Louis M. Nims, State Commissioner of Revenue, and Sanford Brown, State Treasurer, from collecting tax and praying that PA 1959, No 263, amending the use tax act be declared unconstitutional and void. Attorney General intervenes as party plaintiff. Submitted October 5, 1959. (Calendar No. 48,442.) Writ granted October 22, 1959.

*Charles C. Lockwood* and *Charles P. Lockwood,* each *in propria persona.*

*Paul L. Adams,* Attorney General, *Joseph B. Bilitzke,* Deputy Attorney General, *Samuel J. Torina,* Solicitor General, and *Leon S. Cohan,* Assistant Attorney General, for intervening Attorney General.

*Stanton S. Faville,* Chief Assistant Attorney General, *T. Carl Holbrook* and *William D. Dexter,* Assistants Attorney General, for defendants by direction of the Attorney General.

CARR, J. *(dissenting).* The legislature of the State at its current session undertook to increase revenues deemed necessary to defray governmental expenses. To accomplish that end PA 1959, No 263, was enacted as an amendment to the use tax act of 1937.* Said amendment followed in terminology the language of the statute as originally adopted. By section 3 thereof provision was made for an increase of the use tax to 4%, subject to the further provision that if the property used, stored or consumed, had been acquired in a transaction on which the 3% sales tax† had been paid then the use tax should be 1% of the price of the property involved. In practical effect the exemption contained in the 1937 use tax act applicable to instances in which the sales tax had been paid to the State was continued to the extent of such payment.

At the general November election in 1946 an amendment to the Constitution was adopted adding thereto article 10, § 23, providing for the return to local governmental units and school districts of

---

* PA 1937, No 94 (CL 1948, § 205.91 *et seq.,* as amended [Stat Ann 1950 Rev § 7.555(1) *et seq.,* as amended]).

† PA 1933, No 167, as amended (CL 1948, § 205.51 *et seq.,* as amended [Stat Ann 1950 Rev § 7.521 *et seq.,* as amended]).

certain portions of the sales tax collected. As amended at the general November election of 1954, said section of the Constitution reads as follows:

"On and after July 1, 1955, there shall be returned to local governmental units by the method hereinafter set forth, 1/2 cent of a State sales tax levy on each dollar of sales of tangible personal property on the 1946 statutory base (not rate). The State disbursing authority shall remit to counties as a whole on a population basis and payment shall be made to the county treasurer who shall remit to the respective cities, townships and villages within the county on a per capita basis. Population computation shall be based on the last and each succeeding State-wide Federal census for purposes of division among counties and upon the same basis or upon any special Federal county-wide census, whichever is later, for intra-county division purposes: Provided, That there shall be excluded from such computation 50% of the total number of persons who are wards, patients and/or convicts committed to and/or domiciled in any city institution located outside the boundaries of said city or committed to or domiciled in any county, State or federal tax supported institution, provided such persons were included in said Federal census. All remittances provided shall be made on a quarterly basis.

"On and after July 1, 1955, there shall be set aside for the school districts 2 cents of a State sales tax levy on each dollar of sales of tangible personal property on the 1946 statutory base (not rate), to be allocated among said school districts by law. Such taxes so collected shall be deposited in a special school aid fund and be expendable only by legislative appropriations for aid to the school districts and school employees retirement purposes as shall be provided by law. Said school aid fund shall be separate and distinct from the State general fund.

"Prior to any division or allocation of the sales tax, the cost of collection as determined by the de-

partment of revenue shall be deducted from total collections and credited to the general fund of the State.

"The legislature shall by law appropriate from the school aid fund for such public school employees' retirement system as shall from time to time be in effect under the laws of this State an amount which shall not be less than 5% nor more than 7-1/2% of the salaries of school district employees participating in the respective retirement systems: Provided, That such percentages shall apply only to that portion of salary as may be provided by law: Provided, That at no time shall the legislature levy a sales tax of more than 3%.

"The provisions of section 23 of article 10 as constituted prior to the effective date of this amendment shall continue in force and effect until July 1, 1955, and all sums collected and payable thereunder shall be paid."

Plaintiffs in the instant mandamus proceeding instituted said action by petition for the issuance of a writ restraining the defendant State officers from collecting the added use tax imposed by the amendment of 1959, claiming that the said act is unconstitutional in that it undertakes to provide for an increase in the sales tax and as such is within the inhibition of the Constitutional provision above quoted limiting the amount of the sales tax to 3%. The attorney general of the State has intervened in the case as a party plaintiff, asking that the relief sought be granted and that the Court find that all provisions of the amendment of 1959 relating to the 1% increase in the use tax be held unconstitutional. On behalf of defendants answer has been filed to plaintiffs' petition, denying the right to the relief thereby sought and asserting that the State legislature has not exceeded its powers in the adoption of PA 1959, No 263. Briefs have been filed

on each side of the controversy, and counsel have also advanced their claims in oral argument.

The attack on the statute is directed primarily against the provisions of section 3, which reads as follows:

"There is hereby levied upon and there shall be collected from every person in this State a specific tax for the privilege of using, storing or consuming tangible personal property in this State, which tax shall be equal to 4% of the price of such property, except that the tax shall equal only 1% of the price of such property when acquired in a transaction on which a tax is payable under the provisions of Act No. 167 of the Public Acts of 1933, as amended, being sections 205.51 to 205.78 of the Compiled Laws of 1948, and to such tax there shall be added penalties and interest where applicable as hereinafter provided. For the purpose of the proper administration of this act and to prevent the evasion of the tax hereby levied, it shall be presumed that tangible personal property purchased by any person for delivery in this State is purchased for storage, use or other consumption in this State.

"The tax imposed by this section for the privilege of using, storing or consuming a vehicle shall be collected prior to the transfer of any vehicle title, except transfers to a licensed dealer for purposes of resale, that arises by reason of a transaction made by a person who does not transfer vehicles in the ordinary course of his business done in this State. Notwithstanding any limitation contained in section 2 of this act, the price of any vehicle subject to taxation hereunder shall be measured by the value in money thereof as fixed pursuant to rules and regulations promulgated by the department: Provided, That no value in money shall be established when the transaction is made by reason of a bona fide gift including transfer as a gift to a beneficiary in the administration of an estate or when the trans-

action is a sale by a public official in the administration or enforcement of law.

"The department is hereby authorized to utilize the services, information or records of any other department or agency of the State government in the performance of its duties hereunder, and other departments or agencies of the State government are required to furnish such services, information or records upon the request of the department."

The question at issue is whether the section above quoted does in fact, as plaintiffs assert, undertake to provide for an increase in the sales tax, or, on the contrary, as counsel for defendants insist, is it a proper exercise of the legislative authority to levy a tax on the use, storage or consumption in this State of tangible personal property. In determining the legislative intent we must look primarily to the language employed. As before noted, in specifying the nature of the excise tax to be levied the language of the enactment of 1937 was followed. In specific terms the burden of the tax is on the privilege of "using, storing or consuming" tangible personal property acquired for the purpose indicated. No claim is made that PA 1937, No 94 is invalid, or that there is any uncertainty as to the nature of the tax thereby imposed, or that the construction placed thereon by this Court in *Banner Laundering Co.* v. *State Board of Tax Administration,* 297 Mich 419, in which the validity of the enactment was sustained, was not correct.

On behalf of plaintiffs it is contended that the statement by the legislature as to the nature of the tax is not of material significance. In view of the fact that the question before us is primarily one of statutory construction we cannot agree that the intention of the legislature, clearly expressed by the language used, can be ignored. The correct rule on this subject, which should be deemed ap-

plicable in the instant case, was set forth by the United States supreme court in *Flint* v. *Stone Tracy Company,* 220 US 107, 145 (31 S Ct 342, 55 L ed 389, Ann Cas 1912B, 1312), as follows:

"While the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act, nevertheless the declaration of the lawmaking power is entitled to much weight, and in this statute the intention is expressly declared to impose a special excise tax with respect to the carrying on or doing business by such corporation, joint stock company or association, or insurance company. It is therefore apparent, giving all the words of the statute effect, that the tax is imposed not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business and with respect to the carrying on thereof."

It has been repeatedly recognized by this Court and by other courts as well that a legislative enactment is presumed to be constitutional. It cannot be held otherwise unless it clearly appears that it violates some provision of the Constitution of the State, or is in conflict with Federal law. Such rule has been emphasized in tax cases. In *Thoman* v. *City of Lansing,* 315 Mich 566, 576, it was said:

" 'The presumption of constitutionality following taxing statutes is stronger than applies to laws generally and only where a taxing system clearly and palpably violates the fundamental law will it be held invalid.' *Michigan Central R. Co.* v. *Powers,* 201 US 245, 267 (26 S Ct 459, 50 L ed 744), citing numerous decisions of the United States supreme court."

Among other decisions of like import is *Evans Products Co.* v. *State Board of Escheats*, 307 Mich 506, in which the constitutionality of PA 1941, No 170 was assailed. It was there said (p 533):

"Courts are bound, whenever possible, so to construe statutes as to give them validity and a reasonable construction (*Van Fleet* v. *Van Fleet*, 49 Mich 610); courts should lean toward that construction which will give the statute force and validity (*Thomas Canning Co.* v. *Southern Pacific Co.*, 219 Mich 388); the validity of a statute must be sustained unless it is prohibited by the express language of the Constitution or by necessary implication (*Child Welfare Society of Flint* v. *Kennedy School District*, 220 Mich 290); and it is our duty to adopt such a construction, if admissible, which will uphold validity rather than destroy a legislative enactment (*People* v. *Lockhart*, 242 Mich 491; *In re Harrand*, 254 Mich 584). Since 1844 (*Green* v. *Graves*, 1 Doug [Mich] 351), it has been a frequently repeated rule in construing statutes in this State that a statute should not be declared unconstitutional unless the conflict between the Constitution and the statute is palpable and free from reasonable doubt."

Of like import are: *In re Watson*, 293 Mich 263, 275; *1426 Woodward Avenue Corp.* v. *Wolff*, 312 Mich 352, 370; *Stadle* v. *Township of Battle Creek*, 346 Mich 64, 69. The rule is equally well established that the burden rests on one challenging the validity of a legislative enactment to establish objections thereto on constitutional grounds. *Newark Fire Insurance Co.* v. *State Board of Tax Appeals*, 307 US 313, 324 (59 S Ct 918, 83 L ed 1312).

Any assumption that a sales tax and a use tax are without substantial differences is unfounded. They are alike in that each is an excise tax levied on a privilege. However, those privileges are not

identical. The sales tax is imposed, as the statute creating it plainly specified, on the privilege of engaging in the business of making sales at retail as defined in the act, said tax being based on gross proceeds. CLS 1956, § 205.52 (Stat Ann 1950 Rev § 7.522). As pointed out in *City of Wyandotte* v. *State Board of Tax Administration*, 278 Mich 47, 53, the tax is not imposed upon the consumer, but, rather, on those engaging in the business of making retail sales. The taxpayer, that is, the retailer, may include the amount of the tax in the selling price but is not required to do so. *Swain Lumber Co.* v. *Newman Development Co.*, 314 Mich 437. The act further provides that a person engaged in the business of selling tangible personal property at retail shall not advertise or hold out to the public that the tax is not included in the price, and it is also specifically declared (CLS 1956, § 205.73 [Stat Ann 1950 Rev § 7.544]) that the taxpayer shall not be deemed prohibited by anything in the statute from reimbursing himself by adding to his sale price the amount of the sales tax. That the retailer is the taxpayer under the specific language of the sales tax act has been repeatedly recognized. The legal incidence of such tax falls on him. *Federal Reserve Bank of Chicago* v. *Department of Revenue*, 339 Mich 587; *National Bank of Detroit* v. *Department of Revenue*, 340 Mich 573.

The language of the use tax act of 1937 definitely indicated the nature of the said tax as an excise or privilege tax imposed on the privilege of using, storing or consuming "tangible personal property," which one has caused to become located in this State, and which is not within any of the exemptions specified in the act. It has been so construed by this Court. *Western Electric Co.* v. *Department of Revenue*, 312 Mich 582; *Kress* v. *Department of Revenue*, 322 Mich 590. The latter case expressly

recognized the fact that in some respects the use tax act was complementary to the prior sales tax act.   Reference has been made repeatedly in decisions dealing with use taxes that legislation providing for such method of raising revenue was found to be expedient because, for obvious reasons, the sales tax could not be imposed on purchases of personal property outside of a State, even though the property was intended to be brought into such State and used, stored or consumed there.   A result of that situation was to encourage to some extent at least the making of purchases by residents of Michigan in interstate commerce, thus avoiding the burden of the sales tax.   This created what was regarded as an inequality and a discrimination against those selling goods at retail in this State. The use tax has been considered as complementary to the sales tax in that it did away with the alleged inequality and discrimination, the net result being to increase the revenues of the State.

This consideration of the excise taxes in question as being complementary, each to the other, carries with it the recognition of the fact that they are not identical.   As a practical proposition they are assessed on different privileges, and the legal incidence of the tax falls in one case on the retailer and in the other on the user, storer or consumer. The fact that the seller of the goods designed for use, storage or consumption in Michigan is required by the statute to collect on behalf of the State the amount due from the purchaser does not alter the situation.   The use tax is not imposed on such seller, but, rather, on the party exercising the privilege of use, storage or consumption, as the case may be.   One may be charged with the duty of collecting a tax on behalf of government although the ultimate burden of such tax does not rest on him.   In *Colorado National Bank of Denver* v. *Bedford,* 310 US

41 (60 S Ct 800, 84 L ed 1067), there was involved the validity of a statute of the State of Colorado requiring banks to collect from those to whom they rendered services for hire the amount of the tax levied under the State statute on such services, including the use of safety vaults. The State treasurer instituted action to recover from the defendant bank the amount of the tax that the latter was required to collect. Recovery was resisted on the ground that the bank was a Federal agency and not subject to taxation by the State. In rejecting such claim it was said (pp 52, 53):

"The person liable for the tax, primarily, cannot always be said to be the real taxpayer. The taxpayer is the person ultimately liable for the tax itself. The funds which were received by the State came from the assets of the user, not from those of the Federal instrumentality, the bank. The Colorado supreme court holds the user is the taxpayer. The determination of the State court as to the incidence of the tax has great weight with us and, when it follows logically the language of the act, as here, is controlling. As the user directly furnishes the funds for the tax, not as an ultimate consumer with a transferred burden but by section 12 of the act as the responsible obligor, we conclude the tax is upon him, not upon the bank. The Constitution or laws of the United States do not forbid such a tax.

"The tax being a permissible tax on customers of the bank, it is settled by our prior decisions that the statutory provisions requiring collection and remission of the taxes do not impose an unconstitutional burden on a Federal instrumentality. Especially is this true since the bank under the Colorado act is allowed 3% of the tax for the financial burden put upon it by the obligation to collect."

As declared in *Nelson* v. *Sears, Roebuck & Co.*, 312 US 359, 363 (61 S Ct 586, 85 L ed 888, 132 ALR 475):

"The validity of such a tax (use tax), so far as the purchaser is concerned, 'has been withdrawn from the arena of debate.' "

It was also pointed out, quoting from a prior decision, that the use tax is assessed on the privilege of use after commerce is at an end.

The use tax act of Michigan as adopted by the legislature in 1937 followed the general form of such statutes that had been previously adopted in other States. Among such was the Washington statute which is of particular interest in view of the discussion in the briefs of counsel in the instant case with reference to the nature of the sales and use taxes and their relationship. The State of Washington prior to the adoption of the use tax act by its legislature had imposed a sales tax in the sum of 2% on retail sales of tangible personal property. The use tax act contained a specific provision that:

"If any article of tangible personal property has already been subjected to a tax by this or any other State in respect to its sale or use in an amount less than the tax imposed by this title, the provisions of this title shall apply, but at a rate measured by the difference only between the rate herein fixed and the rate by which the previous tax upon the sale or use was computed."

The Washington statute was before the supreme court of the United States on appeal in *Henneford v. Silas Mason Co.,* 300 US 577 (57 S Ct 524, 81 L ed 814), and was sustained. Speaking through Justice Cardozo attention was called to the fact that the exemption under the use tax was not in all cases complete because of payment under a sales tax in Washington or elsewhere, or a use tax. Commenting on the statute, Justice Cardozo concluded that

the objections urged against its validity were not well-founded, saying in part (p 581):

"The plan embodied in these provisions is neither hidden nor uncertain. A use tax is never payable where the user has acquired property by retail purchase in the State of Washington, except in the rare instances in which retail purchases in Washington are not subjected to a sales tax. On the other hand, a use tax is always payable where the user has acquired property by retail purchase in or from another State, unless he has paid a sales or use tax elsewhere before bringing it to Washington. The tax presupposes everywhere a retail purchase by the user before the time of use. If he has manufactured the chattel for himself, or has received it from the manufacturer as a legacy or gift, he is exempt from the use tax, whether title was acquired in Washington or elsewhere. The practical effect of a system thus conditioned is readily perceived. One of its effects must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other States who are exempt from a sales tax or any corresponding burden. Another effect, or at least another tendency, must be to avoid the likelihood of a drain upon the revenues of the State, buyers being no longer tempted to place their orders in other States in the effort to escape payment of the tax on local sales."

In the case at bar the charge is made on behalf of plaintiffs that the legislature, in the enactment of the amendment here in question in terms imposing a use tax, resorted to a "subterfuge." Such claim is obviously based on the theory that the tax imposed by the amendment is actually a sales tax, an assumption with which we cannot agree. The language of the statute does not warrant such conclusion, and the fact that the tax is imposed on the one using, storing or consuming the goods, rather than on the retailer for the privilege of sell-

ing, must be taken to indicate that the legislature intended exactly what it specified, namely, a use tax. The fact that the value of such use is measured by the purchase price has no controlling significance, nor does the manner of collection of the tax make it other than what the legislature has declared it to be.

It must be borne in mind also that we are not dealing here with any attempt to raise funds for an unauthorized purpose under the guise of a legitimate exercise of the taxing power. Decisions involving situations of such character have no bearing. The legislature of this State unquestionably is endowed with authority to levy a use tax. It has exercised that authority. Where is there any element of a subterfuge in the proper meaning of that term? In view of the claim made, it may be noted that in *Henneford* v. *Silas Mason Co., supra,* a like argument was advanced in the attack made on the use tax of the State of Washington. With reference thereto Justice Cardozo said (pp 587, 588):

"Finally, there is argument that the tax now in question, though in form upon the use, was in fact upon the foreign sale, and not upon the use at all, the form being a subterfuge. The supposed basis for that argument is a reading of the statute whereby the use shall not be taxable if the chattel was manufactured by the user or received as a legacy or acquired in any way except through the medium of purchase, and a retail one at that. But the fact that the legislature has chosen to lay a tax upon the use of chattels that have been bought does not make the tax upon the use a tax upon the sale. One could argue with as much reason that there would be a tax upon the sale if a property tax were limited to chattels so acquired. A legislature has a wide range of choice in classifying and limiting the subjects of taxation. *Bell's Gap R. Co.* v. *Pennsylvania,* 134 US 232, 237 (10 S Ct 533, 33 L ed 892); *Ohio Oil Co.*

v. *Conway,* 281 US 146, 159 (50 S Ct 310, 74 L ed 775). The choice is as broad where the tax is laid upon one or a few of the attributes of ownership as when laid upon them all. *Flint* v. *Stone Tracy Co.,* 220 US 107, 158, 159 (31 S Ct 342, 55 L ed 389, Ann Cas 1912B, 1312). True, collections might be larger if the use were not dependent upon a prior purchase by the user. On the other hand, economy in administration or a fairer distribution of social benefits and burdens may have been promoted when the lines were drawn as they were. Such questions of fiscal policy will not be answered by a court. The legislature might make the tax base as broad or as narrow as it pleased."

The language above quoted may well be applied to the claim of plaintiffs in the instant case in characterizing the legislative action in the manner indicated. If resorting to the use tax act as a medium for the raising of necessary funds for State purposes was actually a subterfuge because of the fact that an increase in the sales tax was inhibited by the Constitution, it is apparent that a like charge might be made with reference to the enactment of the use tax act of 1937, which, as counsel suggests, was prompted, at least in part, by the inability of the State to tax retail sales of personal property made elsewhere, but intended for use and enjoyment in Michigan, due to restrictions imposed by the Federal Constitution. The obvious answer is that accomplishing a desired purpose in a certain authorized manner is not open to criticism because of the fact that a different method might have been adopted is permissible. So far as the instant case is concerned the legislature is clothed with authority to provide for raising revenue by a use tax. Its action in so doing is not subject to attack on constitutional grounds.

The principles recognized and applied in the *Henneford Case,* above cited, have been accepted in subsequent decisions. In *McLeod* v. *Dilworth Co.,* 322 US 327 (64 S Ct 1023, 88 L ed 1304), the Federal supreme court had under consideration a statute of the State of Arkansas, the issue being the right of the State to collect a sales tax on purchases made outside of the State. Discussing the difference between sales and use taxes, Justice Frankfurter, speaking for the majority of the court, said (p 330):

"A sales tax and a use tax in many instances may bring about the same result. But they are different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds. A sales tax is a tax on the freedom of purchase—a freedom which wartime restrictions serve to emphasize. A use tax is a tax on the enjoyment of that which was purchased. In view of the differences in the basis of these 2 taxes and the differences in the relation of the taxing State to them, a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of the goods sold, involves an assumption of power by a State which the commerce clause was meant to end."

The statement that the sales tax and the use tax are complementary may not be taken to mean that one may not be enacted without the other, or, more specifically, that a use tax cannot be adopted by a legislature of a State other than for the purpose of complementing a prior enacted sales tax. Counsel make no specific claim in this respect nor do they cite authorities indicating any such situation. As above noted, the Washington use tax act involved in the *Henneford Case* granted an exemption *to the extent* that a sales tax had been paid in that State on the sale of the property involved in the use, or

that such a tax or a use tax had been paid in another State. The act in question in the case now before us, PA 1959, No 263, in practical effect accomplishes a like result. Fixing the use tax at 1% where a sales tax has been paid on the transaction in which the consumer acquired the property is, of course, identical with regarding the use tax as 4% with an exemption of the amount of sales tax paid either in Michigan or elsewhere.

No claim is made that any provision of our Constitution restricts the right of the legislature to levy a use tax. The fact that, as a matter of policy, the use and sales taxes imposed in the State have heretofore been kept on a like basis as to amount does not necessitate, as a legal proposition, that such policy be continued. If by force of circumstances a departure therefrom has been found necessary or expedient what provision of our Constitution is violated thereby? The rule seems to be well-settled by authority that 2 or more excise taxes may be imposed "where the privileges or activities taxed are clearly separable and distinct." 51 Am Jur, Taxation, § 293, p 346. *Harder's Fire Proof Storage and Van Co.* v. *Chicago,* 235 Ill 58 (85 NE 245, 14 Ann Cas 536); *Corn* v. *Fort,* 170 Tenn 377 (95 SW2d 620, 106 ALR 647).

On behalf of plaintiffs it is claimed that the sales tax and use tax, in operation, are merged and collected as one. If such were the actual situation the constitutionality of the amendatory act of 1959 in question here would not be affected. We are concerned with the measure as enacted by the legislature, rather than with the administrative procedure followed in the collection of taxes and the handling of revenue. However, any merger of the collections made under the sales tax act and the use tax act would scarcely be permissible in view of the fact that the proceeds of the sales tax must be

apportioned and distributed in the manner specified in article 10, § 23, of the Constitution (1908). Such requirement is not imposed with reference to funds derived by the State from the use tax. The section of the Constitution in question and the proper procedure thereunder were discussed by this Court in *City of Jackson* v. *Commissioner of Revenue,* 316 Mich 694. It must be assumed that the requirements imposed by said amendment to the Constitution have been, and are being, observed. The argument based on manner of collection and alleged merger does not require further consideration. Likewise, the validity of PA 1959, No 263, is not open to attack on the basis of the method selected by the legislature for determining the value to the taxpayer of the privilege of using, storing or consuming tangible personal property purchased at retail sale. The plenary control of the State through its legislature with reference to matters of taxation has been repeatedly recognized, not only by State courts of last resort but by the supreme court of the United States. *Citizens' Telephone Co. of Grand Rapids* v. *Fuller,* 229 US 322 (33 S Ct 833, 57 L ed 1206).

As above pointed out, the arguments advanced against the constitutionality of PA 1959, No 263, are based on the claim that the tax thereby imposed is in violation of article 10, § 23, of the Constitution, and specifically of the inhibition therein contained with reference to imposing a sales tax of more than 3%. The briefs filed do not refer to any other provision of the Constitution claimed to be contravened by the enactment. For the reasons above set forth the tax imposed by said act is not a sales tax. The controlling features of the measure are in accord with the declaration of the legislature as to the nature of the tax imposed. It is based on the privilege of using, storing and consuming tangible personal property that has been purchased at retail for such

use and enjoyment within this State. The burden of the tax falls on the user and not, as under the sales tax act, on the seller of the property. The privilege of making the sale is not the basis of the use tax.

The amendatory act of the legislature at issue in the present case does not violate the provision of article 10, § 23, of the State Constitution (1908) forbidding the legislature to levy a *sales tax* in excess of 3%. The language of said provision is clear and unequivocal. It indicates the purpose stated and nothing more. It does not apply to the use tax and may not be so interpreted without reading into the amended section of the State Constitution an unwarranted inhibition on the power of the legislature that is neither expressed nor implied.

It will be noted that article 10, § 23, hereinbefore set forth as modified at the general election in November, 1954, provides for the apportionment of the revenues received from a tax levy on sales of tangible personal property. That reference was intended to the sales tax act of 1933 is not questioned, nor is it open to question. No mention is made of the diversion of funds received by the State under the use tax act of 1937, and such funds are not apportioned, in part, to school districts and municipalities of the State. We have in consequence a practical and accepted construction of the term "sales tax." No claim has been made in the past, or in the briefs and oral argument in the instant case, that the revenues received by the State under the use tax act are subject to apportionment in the same manner as are the proceeds of the sales tax levy.

It is incredible that the legislature in submitting to popular vote the proposed amendment at the general election in 1954, or that the people in voting

thereon, intended that the term "sales tax" as used in the clauses of said amendment providing for the apportionment of sales tax funds in the manner stated therein, and in inhibiting the legislature from increasing the sales tax above 3%, intended to use the term in question with different meanings. In other words, it must be assumed that the designation was used in the proviso imposing limitation on the power of the legislature with reference to the increase in the sales tax with exactly the same meaning as clearly intended in the so-called diversion clauses.

On the oral argument of the case the suggestion was made by counsel for plaintiffs that the people in adopting the Constitutional amendment at the general election in 1954 contemplated that the sales tax limitation as to amount should be applicable to an increase in the use tax over and above 3%. There is no logical basis for such claim. Certainly the language of said amendment does not indicate it, nor may it be assumed that voters in passing on the adoption of the amendment did not fully realize the natural import of the language contained therein. It is a matter of general knowledge that both the sales tax act and the use tax act were publicized, and information concerning each disseminated to the people of the State. We are not justified in assuming that the voters adopting the amendment in question did not understand fully the conditions giving rise to the enactment of the sales tax act of 1933 and of the use tax act of 1937, the necessity for such measures for the production of revenue for governmental purposes, the administration of each of said acts, and the litigation which led to the upholding thereof as proper exercise of legislative authority. There is nothing in the language of article 10, § 23, or in the situation existing at the time of the adoption thereof in its present form, that may

properly be said to indicate a belief on the part of voters that the term "sales tax" included the use tax. Had it been intended to extend the limitation on the power of the legislature to the latter tax the conclusion cannot be avoided that appropriate language to that end would have been used. How may this Court determine such question of intent other than by reference to the plain language of the amendment as adopted? Such language is so clear and specific that there is no justification or excuse for ignoring it or for indulging in conjecture or speculation as to the existence of some hidden intent not indicated in any way. If such there was, it was not incorporated in the amendment.

It may be noted further in this connection that Michigan is said to be the only State, among the many levying a tax on the sale of tangible personal property at retail, that has imposed a limitation on the power of the legislature. It thus appears that the prohibition actually set forth in the amendment with reference to the sales tax is unique, a fact that itself suggests the impropriety of extending it beyond its specific terms. There is no tangible basis whatever for the claim that the people in adopting the Constitutional amendment intended to impose a limitation of the same kind on the power of the legislature to enact a use tax as expressly declared with reference to the sales tax. If any such meaning were to be given to the language of such limiting proviso, a like construction must also be accepted with reference to the meaning of the provisions of the amendment requiring the apportionment among school districts and municipalities of the greater part of the sales tax. If "sales tax" includes "use tax," then the revenues derived from the latter tax would of necessity be subject to apportionment. As noted, however, such claim is not made in this case, nor has it been suggested that

such a situation has existed since the adoption of the constitutional amendment. Obviously we cannot logically give 2 different meanings to the term "sales tax" as used in such amendment. The conclusion cannot be avoided that it has but 1 meaning and does not, in either instance in which it is used, include the use tax. We repeat that there is no justification for extending the scope of article 10, § 23, beyond its express provisions. There is no basis on which this Court may do so.

This case was argued and submitted for determination Monday afternoon, October 5th. On October 9th the foregoing opinion was distributed to the members of the Court. Justice SMITH, under date of October 16th, served his opinion, indicating therein his reasons for concluding that the relief sought by plaintiffs should be granted. We are not in accord with such reasons or with the conclusion based thereon, and wish to comment briefly with reference to the issues presented.

The act in question was enacted by the legislature and was given immediate effect by more than the 2/3 vote required by the Constitution (1908), article 5, § 21. It was signed by the governor of the State and became effective on September 1, 1959. It seeks to raise revenue essential for the support of our State government and the performance of functions vital to the welfare of the State and its people. It is entitled to every presumption in favor of its validity, and it may not be held a nullity unless it clearly and beyond reasonable doubt violates some provision of the State Constitution or paramount Federal law.

The constitutionality of the act is challenged solely on the ground that it violates the provision of article 10, § 23, of the State Constitution as amended by the people at the November, 1954, general election. The specific clause of said section that is in-

voked is the limitation on the power of the legislature to enact a *sales tax* in excess of 3%. No other provision of our Constitution is relied on to support the claim of invalidity of the act, nor is it asserted that it in any way conflicts with Federal law. The basic question at issue is, in consequence, whether the amendment of 1959 to the use tax act of 1937 falls within the scope of the inhibition with reference to the sales tax. Justice SMITH contends that it does, basing his argument in that respect on the theory that such was the intent of the people in adopting the constitutional provision—notwithstanding the fact that no reference to a use tax was made therein.

Basically the question is: How shall the language of the constitutional inhibition against the sales tax be construed? No claim is made that the expression "sales tax" as used with reference to the apportionment of said tax was intended to apply to proceeds of the use tax as enacted in 1937 and amended by PA 1949, No 273. Neither is it claimed that the language of the amendment is ambiguous in any respect. On the contrary, it is clear and specific. The intent expressed thereby is not open to question. The rule of construction heretofore recognized by this Court and by courts of other States, as well as by the supreme court of the United States, was well expressed in *Attorney General* v. *State Board of Assessors,* 143 Mich 73, 76, 77. Involved there was the meaning of article 14, § 11, of the State Constitution of 1850, which section provided for a uniform rule of taxation and for the rate of taxation for property assessed by the State board of assessors. In connection with its conclusion that the Constitutional provisions must be interpreted in accordance with the language used therein, it was said:

"But 2 principles of construction need be referred to, both of which are well settled in this State. The first is that the legislature has power to adopt a statute, except as it is prohibited by the Constitution (*Smith* v. *Lake Shore & M. S. R. Co.*, 114 Mich 460); and that a statute will not be declared in conflict with the Constitution while serious doubt exists as to such conflict. The other principle is that the first resort, in all cases where a constitutional provision is to be interpreted, is to the natural signification of the words employed in the order and grammatical arrangement in which the framers of the instrument have placed them; and, if thus regarded, the words used convey a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then the meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such cases there is no room for construction. Cooley, Constitutional Limitations (5th ed), pp 69, 70."

The rule announced in the language quoted has been repeatedly recognized by this Court and is in accord with the language of the opinion of the Federal supreme court in *McPherson* v. *Blacker,* 146 US 1 (13 S Ct 3, 36 L ed 869). It was there recognized by the court, in sustaining an act of the legislature of Michigan, that the framers of the Federal Constitution had employed words in their natural sense, and (p 27) that where the language used is plain and clear "resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text."

The general rule with reference to interpretation of constitutional provisions conforms with that of this State as above set forth, and is summarized in 16 CJS, Constitutional Law § 19, pp 81 to 84, as follows:

"If the language used is clear and unambiguous its meaning and intent are to be ascertained from the instrument itself by construing the language as it is written. Unless the context suggests otherwise, words are to be given their natural obvious, or ordinary meaning. To ascertain the meaning of a Constitution, therefore, the first resort in all cases is to the natural signification of the words used, in the order and grammatical arrangement in which the framers have placed them. If, thus regarded, the words used convey a definite meaning which involves no absurdity and no contradiction between parts of the same writing, then the meaning apparent on the face of the instrument is the one which alone courts are at liberty to say was intended to be conveyed. There is no occasion for construction where the language is plain and definite."

In accord is 11 Am Jur, Constitutional Law § 65, p 682, where it was said:

"The courts are not at liberty to disregard the plain meaning of words of a Constitution in order to search for some other conjectured intent."

In the case at bar we may not interpret the clear language of the constitutional inhibition against an increase in sales tax above 3% other than by giving thereto the clear and specific meaning of the language used. We may not enlarge the scope of the restriction by indulging in speculation or by conjecturing that the people in adopting the amendment intended something not expressed therein. Justice SMITH cites in his opinion *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, to support the theory that a constitutional provision should not be subjected by the Court to a process of "erosion" or "attrition." *By like process of reasoning a provision of the fundamental law of the State may not be enlarged beyond the scope of its unambiguous expression by reading into it a purpose,*

*intent, or meaning not within its terms.* The people, and only the people acting in their sovereign capacity, may change the provisions of their Constitution, or of an amendment thereto. This Court in the instant case may not assume the prerogative of enlarging the scope of the provision of article 10, § 23, for the obvious reason that such action would constitute an amendment of said section by court action. The "obvious purpose" of the people in adopting such amendment is clearly expressed in the language used and by that language this Court is bound.

Justice SMITH suggests in his opinion that the reason the legislature was not limited by the constitutional amendment in the imposition of a use tax was due to a lack of need therefor at the time of the adoption of the amendment. It must be assumed that the sponsors of the constitutional amendment, and the people in voting on it, were well aware of the existing use tax and of the authority of the legislature with reference thereto. However, if it be assumed that specific reference thereto was omitted for the reason suggested, by what process of reasoning can this Court now read into the amendment a provision intentionally omitted? The Court may not broaden the clause relating to the sales tax on the theory that a like provision might have been made, or should have been made, with reference to the use tax. Whatever the reason, the fact is that the latter limitation was not imposed and this Court may not amend the action of the people by interpolating it.

In assailing the validity of the 1959 amendment to the use tax act emphasis is placed on the method of collection. It must be borne in mind, however, that such method is identical with that employed in the use tax act as first enacted. It is also the method employed in such acts adopted in other

States, the validity of which has been sustained uniformly by decisions of State and Federal courts. The answer is that manner of collection, and the selection of those who shall act for the State in that respect, was for the determination of the legislature as a matter of policy. If the legislature had prescribed other means for collection and the enforcement of payment, would the situation be in any way changed insofar as the validity of the act is concerned? Suppose, by way of illustration, that recourse had been had to the tax collection machinery of local units of government, with the duty to make periodic reports and payments thereto, or to a procedure analogous to that prescribed in the intangible tax law*, would this objection to the act be obviated? The legislature adopted the method deemed to be the most practical, particularly so in the light of the experience in the administration of the sales tax and of the use tax of 1937.

The differences between a sales tax and a use tax are clearly apparent. The decisions of the United States supreme court involving such question leave no doubt in this respect. The first tax is based on the privilege of selling tangible personal property at retail. The use tax is imposed on the privilege coming into being subsequent to the sale, of using, storing or consuming the property. They are alike in being excise taxes but obviously the privileges taxed are separate and clearly defined. The modification of article 10, § 23, at the general election in 1954 was proposed by resolution of the legislature. It may not be doubted that the sponsors of the modification, and the members of the legislature generally, had clearly in mind the history of the sales tax and of the use tax and the basis on which each rested. It may not be assumed that the legis-

---

* PA 1939, No 301 (CL 1948, § 205.131 *et seq.*, as amended [Stat Ann 1950 Rev § 7.556(1) *et seq.*, as amended]).

lature in submitting the question to the people, or that the people in voting for the proposed changes, including the limitation on the sales tax, did not fully understand the obvious meaning of the language used. The only possible conclusion is that it was not intended to limit the authority of the legislature with reference to the use tax. Had it been so intended, we must conclude that such intent would have been expressed. Neither is the claim tenable that the use tax as imposed under the amendment of 1959 is actually on the sale of the property. As under the act of 1937, the tax is on the privilege of using, storing or consuming, and the duty to pay such tax rests on the one exercising such privilege. The 2 taxes are not based on the same transaction and the nature of the use tax is not changed because of the means prescribed by the legislature for the collection of such tax.

An order should enter sustaining the constitutionality of PA 1959, No 263, and dismissing the petition. In view of the nature of the controversy, no costs are allowed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

SMITH, J. The principal question in this case is the meaning of the constitutional provision that "at no time shall the legislature levy a sales tax of more than 3%."*

The sales tax came to us in the depth of a great depression in order to provide the means for fulfilling desperate governmental needs. It was a tax easily collected and possessing the power of producing vast revenue. No meal could be consumed without its payment, no shelter built, no clothing

---

* Const (1908), art 10, § 23, as amended in 1954.

purchased without meeting its exaction, and in advance. It fell on all alike, and without regard to want or ability to bear the tax. Vast sums poured into the State treasury. We will, shortly, look to the distribution of these funds, since therein lies the origin of the situation resulting in the controversy before us. But first we look to the other tax here involved, the use tax.

The sales tax, powerful though it was, was vulnerable to avoidance. If the purchase, possibly of an automobile, were made not in Michigan but in a neighboring State the Michigan sales tax would not apply. Thus not only did the State of Michigan lose the tax moneys but a Michigan merchant lost the sale. It was a double-edged sword. To meet the threat of avoidance a tax was enacted. The article purchased in another State would be taxed in Michigan by virtue of its use here, and at the same rate as if sold in Michigan in the first place. This was the use tax. Through its enactment the flight across the border was blocked, the Michigan merchant protected in his competitive position, and the State tax funds safeguarded.

These, then, in broad outline, are the 2 taxes before the adoption of the constitutional limitation. We now seek the background and the meaning of the constitutional limitation. It did not come to us as an abstract concept. There was a reason for its passage and the reason is clear from a reading of the history of the times.

The sales tax, as we have seen, was a tax of great revenue potentialities to the State, easily collectible, constantly available, and, for the bulk of our people (with respect to their day-by-day purchases), impossible to evade or avoid. It soon became our leading

source of revenue[1] but (and here arises our problem) its resources did not long remain subject to legislative discretion. The first constitutional amendment[2] respecting sales tax moneys took out of the hands of the legislature the spending of most of the 3 cents paid in. One-half of 1 cent went back to the counties and the other half to school districts. These diversions left 2 cents of the tax, but of those 2 cents almost half in turn, also was earmarked by the same amendment,[3] leaving the legislature only a little over one-fifth of the total sales tax moneys available for distribution in its discretion. The source was not drying up, but the bulk of the money was no longer available for the general expenses of government. The next proposal for withdrawing these sales-tax funds from legislative jurisdiction went even further. It proposed to remove from legislative control roughly 1/2 of the relatively meager sum left to it by the first diversion amendment, thus leaving to the legislature for use for general appropriations only 1/2 cent out of each 3 cents collected in tax. It requires no great acuity to anticipate the next step since the path is worn smooth by constant use. It was simply to increase the tax. We need only glance at the history of our income taxes, our gasoline taxes, and other levies, which, starting as taxes in modest amounts, had risen constantly through the years. The sales tax, said our people, was not to follow this well-worn path of constant increases. It was to be limited to 3 cents on every dollar. "At no time," they said, "shall the legislature levy a sales tax of more than 3%."

---

[1] In the year preceding adoption of the prohibition on legislative increase of the sales tax beyond 3%, the sales tax collections totalled 286 millions of dollars. For the same period the sum of 15 million dollars was collected by the use tax. Annual Report, Michigan Department of Revenue, 1954–1955, p 57.

[2] Const (1908), art 10, § 23, added in 1946.

[3] See O.A.G. 1947–1948, p 306, for computation.

It is not enough to solve the problem before us, simply to compare the 2 taxes as they have been applied in the past, and to observe the differences originally existing between them. There is no argument whatever on the point that the sales tax and the use tax had their origins as 2 separate taxes, easily distinguishable and so sustainable. The cases so holding we need not even discuss. If the taxes had been kept so separated this case would not be before us. It is the fitting of the 2 together that has given rise to our problem, just as it is the fitting of the cartridge to the gun that creates the dangerous weapon.

Nor is it helpful that we review decisions of other jurisdictions, passing upon various phases of sales and use taxation and their relation to interstate commerce. They are not in point. Thus in the case of *Henneford* v. *Silas Mason Co.,* 300 US 577 (57 S Ct 524, 81 L ed 814), relied upon by defendants, the challenge to the application of the use tax of the State of Washington to a purchase made in a foreign State was made under the interstate commerce clause of the Federal Constitution. Likewise, in *McLeod* v. *J. E. Dilworth Co.,* 322 US 327 (64 S Ct 1023, 88 L ed 1304), the problem involved the taxability in Arkansas of purchases made outstate. But, again, we would not be sitting in this case upon such facts. The very essence of the case before us is that the purchase was *not* made in a foreign State but in our own. Moreover, none of the language relied upon by defendants involves a specific State constitutional prohibition against an increase in the sales tax. Thus there is actually no precedent whatever for what has been done. What we must rule upon is actually a 3-cornered problem, involving sales tax, use tax, and specific constitutional prohibition applicable to this type of taxation.

Has the recent "use" tax amendment, taken in conjunction with the existing sales tax, offended the constitutional prohibition? We will go at once to the core of the controversy, a retail purchase, over the counter, of tangible personal property in a Michigan community. The first matter to observe is that this purchase, made within this State, in this manner, still is subject to a 3% sales tax. Thus far nothing has been added. The constitutional limitation has been observed. But, according to the recent amendment, a "use" tax of 1% must also now be paid. Does its payment serve to protect the merchant from the competition of an outstate dealer in similar commodities? Obviously not. The seller is a Michigan merchant. Does its payment reimburse the State treasury for a tax payment otherwise payable but lost? Again, no. The sales tax has already been paid. This is something added. Added for what? What is being taxed, not already taxed under the sales tax?

We will look at the words of the law itself. It is contended that the amendment levies the 1% increase upon different persons, a different subject, and by a different measure than does the sales tax.

As to persons and subject, those arguing that the constitutional prohibition on increasing the sales tax does not apply, rely on the following language quoted from the 1% increase amendment:

"Sec. 3. There is hereby levied upon and there shall be collected from every person in this State a specific tax for the privilege of using, storing or consuming tangible personal property in this State, which tax shall be equal to 4% of the price of such property, except that the tax shall equal only 1% of the price of such property when acquired in a transaction on which a tax is payable under the provisions of Act No. 167 of the Public Acts of 1933, as amended, being sections 205.51 to 205.78 of the Complied Laws

of 1948, and to such tax there shall be added penalties and interest where applicable as hereinafter provided."

"Sec. 6. Every person storing, using or consuming tangible personal property or services, the storage, use or consumption of which is subject to the tax imposed by this act, * * * shall, on or before the fifteenth day of each calendar month file with the department a return for the preceding calendar month in such form as may be prescribed by the department, showing the price of each such purchase of tangible personal property or services during such preceding month, and such other information as the department may deem necessary for the proper administration of this act. At the same time each such person shall pay to the department the amount of tax imposed by this act with respect to the purchases covered by such return. Returns shall be signed by the person liable for the tax, or his duly authorized agent if the return is prepared by any person other than the taxpayer, said return shall also be signed by such person and show his address.

"Sec. 7. Each consumer storing, using or otherwise consuming in this State tangible personal property or services purchased for or subsequently converted to such purpose or purposes shall be liable for the tax imposed by this act, and such liability shall not be extinguished until the tax has been paid to the department."

This language standing alone purports to levy the increase upon every user of personal property in Michigan, and purports to require every user to make a monthly report on all purchases of personal property during the preceding calendar month showing every purchase and its price, and to accompany this report with his tax payment.

To give stated effect to this purpose would turn every citizen of Michigan into very nearly a full-

time bookkeeper for the State. Its enforcement problems would beggar description.

In fact, however, the amendment contemplates no such scheme. For by dint of other sections of the amendment and an exception in the sections we have quoted, inserted at the asterisk points, every requirement applicable to the user which is not likewise a requirement under the sales tax is eliminated.

In this regard, we adopt the terminology of the chief assistant attorney general, representing the defendants, in his oral argument before our Court. He termed one of the more important of those alternatives by which any use tax effect is eliminated from this amendment "an accommodation device."

In section 6, in the sentence purporting to require users to keep records of every purchase and file a monthly report thereon, we find inserted where we have printed asterisks an accommodation device. Its language is, "when such tax was not paid to a seller."

This would still imply that the matter was optional with the user, but we find still another accommodation device in section 5 requiring registration of every person engaged in selling tangible personal property, and stating further:

"Any person required to be registered under this act shall collect the tax imposed by this act from the consumer and in the following manner:"

And in section 16 we find criminal penalties provided for any seller who fails or refuses to collect the tax.

The combined effect of these accommodation devices is to convert the tax from one purportedly levied upon the user for his use of personal property, and to be reported and paid by him, into a tax to be collected by the seller at the point of sale and for the

collection and reporting of which he, and he alone, is responsible.

In short, in everything but words which have deliberately been rendered meaningless, the accommodation devices inserted in this amendment, taken in conjunction with the still applicable sales tax provisions, result in exceeding the constitutional limitation of 3% by 1%.

One other distinction between the 1% increase amendment and the sales tax is cited to us. The measure is different. And, indeed, in section 5 we find:

"(2) If the tax rate of 1% is applicable, 1 cent on each dollar of the price of such property, except that where the price includes a fractional part of a dollar, the following rate of collection is applicable to such fractional part:

"(I) Fifty cents to 99 cents, inclusive, 1 cent."

As to the 1% increase, this would apparently mean that no tax was levied or could legally be collected on purchases below 50 cents. And in every supermarket each customer could thus save a quarter of his tax by insisting that every purchase below that figure was a separate transaction. This would indeed be a distinction, for the sales tax act allows the seller to collect and requires him to remit 3% of all gross sales. CLS 1956, §§ 205.52, 205.73 (Stat Ann 1950 Rev §§ 7.522, 7.544).

Here, too, however, we find the accommodation device which eliminates the distinction in the actual operation of the act. Section 9 provides:

"Any seller who remits to the department an amount equal to 4% or 1%, whichever is applicable, of his total taxable sale prices for the period, or the amount of tax actually collected from consumers, whichever is greater, plus penalties and interest, if

any, shall be presumed to have discharged his liability under this act."

In these words any possible remaining differences in measure or in enforcement between the tax increase amendment and the sales tax are eliminated in favor of allowing the seller to collect from the purchaser a 4% tax on sales and discharge his obligation to the State by forwarding same. With these words present, it cannot be said that the language of the statute previously cited requires the seller to collect the 2 taxes separately and report them separately. Every practical motive demands that the seller collect the 2 taxes as 1. And we search the statute in vain to discover any enforceable prohibition against his doing so.

This plainly means that PA 1959, No 263, purporting to increase the use tax by 1%, actually results in an increase in the burden sought to be limited by the constitutional safeguard. The language of the act compels the conclusion that the use tax features of this act were inserted to accomplish what is prohibited by the Constitution, and that the practical effect of the act spelled out in the "accommodation devices" is to attempt to enact a constitutionally prohibited tax increase. We recognize, of course, that some of the language of these accommodation devices was drawn from the preceding use tax statute. It has, however, never been applied before in any manner possibly offensive to the constitutional prohibition we construe here.

At this point we take judicial notice of what every citizen of this State knows from his daily life. In actual operation of the tax, the accommodation devices are being given their intended effect. A tax of 4% upon retail sales is now being collected by retailers in every city and village and township of Michigan. The citizens of this State are under no illusion—the tax payable by them upon their retail

purchases has been increased above the 3% rate despite the prohibition in their Constitution.

We have seen the situation giving rise to the constitutional enactment, and we have seen the words employed by the people. How are they to be interpreted? At this point the defendants find themselves in a dilemma. If they reply that the people were interested in self-protection, in limiting the threat, clearly visible, of taxes on retail sales mounting as the income tax and other taxes have mounted, then they are bound to hold this tax bad for, in conjunction with the sales tax already imposed, it exceeds the 3% limitation. It is the first step in the familiar pattern of tax increases. But they may take the other horn of the dilemma. They may say that the words used, "sales tax," means *literally* that, namely, the sales tax levied by the particular statute which the citizen was subject to, at the time of the constitutional limitation.

But this would freeze, for the life of the constitutional amendment, the sales tax in the precise form used at the time of the amendment, for after change, no matter how slight, it would be no longer the same statute the citizen knew at the time of the constitutional amendment. This literal construction of the words "sales tax" forces the inescapable conclusion that the people have done a futile thing: they have voted themselves a constitutional protection good only until the next session of the legislature. It is a fact readily ascertainable from the public records that the sales tax has been under constant change, both before and after the passage of the constitutional amendment.

There is no middle ground. Either we construe the constitutional limitation literally or we construe it to accomplish its manifest objective and intent.

Which is to be our choice? Actually, there is no choice but one. The unanimous opinion of this

Court, written by Mr. Justice COOLEY close to a hundred years ago,* sets our course in its enunciation of immutable principles:

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power."

The thought is controlling and it is variously expressed. In *People* v. *Barltz,* 212 Mich 580, 585 (12 ALR 520), we ruled that in construing the Constitution we would give it the meaning the people intended it should have. As the *Barltz Case* (relating to the equality of women in the exercise of certain constitutional rights) well demonstrates, the meaning taken to be intended by the people is to be found in their common experience, here of daily retail purchases, not of some unique or isolated incident.

Construing the constitutional words before us, then, in accordance with these principles, their meaning clearly emerges. In their use the people were protecting themselves from the threat of unrestrained taxation of a well-known kind, the more formidable because of the time and the occasion of its exaction. It was an economic threat they faced.

---

* *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499; 506.

It was this they sought to limit. Tax lawyers argue that the amendment before us taxes a "privilege" separate and distinct from that involved in the sales tax. Here we reach the heart of the fallacy in defendants' argument. This is not a simple question of the differences between sales and use taxes. All of this is old straw. It has been threshed again and again. Our question is a new one, without parallel in the cases cited: May tax be piled upon tax despite a constitutional limitation prohibiting the pyramid? Is the accumulation unobjectionable provided only that the added taxes are taxes upon different "privileges"? If so, the constitutional limitation is utterly without meaning for the only limitation upon the number of "privileges" of the citizen subject to taxation is the ingenuity of the tax collector. But why did the people not similarly limit, we are asked, the use tax? Again the answer is clear. There was no need to limit the use tax that the people knew at the time the constitutional prohibition was passed. It was not, as we have heretofore pointed out, then used as it is now sought to be used. In fact, if a sales tax were paid, a use tax was not imposed.

To say that we will construe the words "sales tax" literally, as described above, despite the manifest purpose of the constitutional limitation, is to open the door to the process of erosion so well described by Mr. Justice Black in *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, 164, as "an attritional series of judicial decisions" rendering innocuous, and without the intervention of the electorate, a constitutional prohibition.

The literal construction of the words, without regard to their obvious purpose of protection, is to make the constitutional safeguard no more than a shabby hoax, a barrier of words, easily destroyed by other words. This canon of constitutional construc-

tion we reject.  A constitutional limitation must be construed to effectuate, not to abolish, the protection sought by it to be afforded.  It was Mr. Justice Campbell who wrote as long ago as the 13th volume of the Michigan reports* that:

"If the people, in establishing their government, see fit to place restrictions upon the exercise of any privilege, it must be assumed that in their view the exercise of the privilege without the restriction would be inexpedient and dangerous, and would not, therefore, have been permitted.  Every restriction imposed by the Constitution must be considered as something which was designed to guard the public welfare, and it would be a violation of duty to give it any less than the fair and legitimate force which its terms require.  What the people have said they design, they have an absolute and paramount right to have respected."

We come face to face, then, with what has been termed† "the most pressing rule for constitutional construction," namely, that "the provisions for the protection of life, liberty and property are to be largely and liberally construed in favor of the citizen."

The reasons behind this "most pressing rule" are clear if we will but bear in mind, with Marshall, that it is a Constitution we are construing, our basic charter of government.  Here the people have erected their safeguards, not only against tyranny and brutality, but against the oppression of temporary majorities, and the rapacious demands of government itself.  Here are found words that are beyond words, principles for which men have died and reckoned not the cost.  It is a charter heavy with history, pregnant with the pride of a free people.

---

* *People* v. *Blodgett,* 13 Mich 127, 139.

† *United States, ex rel. Flannery,* v. *Commanding General* (SD NY), 69 Fed Supp 661, 665.

In it they have said to the government itself, in clause after clause: Thus far you may go, but you shall not cross the line we draw. In our country their prohibition is ironclad. It may refer to encroachment on the citizen's person, on his property, or on his purse. That this is "merely" a tax limitation and not one on freedom of speech, or worship, is immaterial. There are no differences in degrees of protection afforded in the constitutional safeguards. With equal alacrity we halt in his tracks, once his foot crosses the line, the inquisitor, the policeman, the tax collector, the legislator, or the executive. Our question is not how far he has passed over the forbidden line, how serious his encroachment, or how aggravated the arrogance. Our duty arises with the trespass itself.

The presumption of constitutionality cloaking all the acts of our co-ordinate branch of government cannot prevail where the statute is "prohibited by the express language of the Constitution or by necessary implication." *Child Welfare Society of Flint* v. *Kennedy School District,* 220 Mich 290. When we put these taxing acts, as we must, to the acid test of examination in terms of their "practical operation,"[1] when we, again as is our duty, "look through forms and behind labels to substance,"[2] what do we find?

Stripped of legalisms and the technical jargon of the tax experts, this is what finally emerges as a result of the legislative act: two taxes, one of 3 cents, and another of 1 cent, are now levied on each dollar of purchase. Both taxes are measured in the same manner, namely, the price paid for the article. Both are paid at the same time, the time of the

---

[1] *Lawrence* v. *State Tax Commission,* 286 US 276, 280 (52 S Ct 556, 76 L ed 1102).

[2] *City of Detroit* v. *Murray Corporation of America,* 355 US 489, 492 (78 S Ct 458, 2 L ed 2d 441).

sale. Both are imposed because tangible personal property is intended for consumption or use. Both apply to transactions wholly within the borders of this State. Both are paid, as a matter of economic fact, and are intended to be paid,[1] by the same person, the consumer. In short a levy of 4% is now made on the sale of every loaf of bread, every pair of shoes, and every stick of furniture despite the constitution limitation of 3%.

Thus our answer: So examined and tested, denying, as we must, "a literal and technical construction" of the Constitution (COOLEY, *supra,* in *People, ex rel. Bay City,* v. *State Treasurer*), we find "a taxing system clearly and palpably violat[ing] the fundamental law." *Thoman* v. *City of Lansing,* 315 Mich 566.

A caveat should be observed: Aware, as we are, that the language of an opinion is to be read, and interpreted, in the light of the facts the court faced when it employed the language in question, we emphasize that such construction applies with added emphasis when the subject matter is one affecting directly the validity of taxation and thus, indirectly, the financial stability of the State. Specifically, as we have observed heretofore, we are ruling upon the correlation of 3 distinct factors: a sales tax, a use tax and a constitutional limitation.

The attorney general prays for relief as follows:

"That this Court rule to be void and in contravention of article 10, § 23 of the State Constitution.

---

[1] We held in *National Bank of Detroit* v. *Department of Revenue,* 334 Mich 132, 138, that: "It is, therefore, clear that it was the intention of the legislature that the general sales tax is a tax whose economic burden falls chiefly on the consumer." To precisely the same effect was our holding in *C. F. Smith Co.* v. *Fitzgerald,* 270 Mich 659, 677, wherein we said:

"The sales tax is a tax imposed upon consumption, a tax upon commodities sold, a tax which is usually and ordinarly paid not by the person who operates the business, but by the customer who purchases and pays for merchandise."

(1908) those provisions of PA 1959, No 263, which attempt to impose an additional tax of 1% upon transactions involving the collection of the sales tax levied under the provisions of PA 1933, No 167, as amended."

The constitutional limitation before us compels the grant of such relief.

Mandamus will, accordingly, issue to the defendants, their servants, agents and employees commanding them to desist and refrain from levying, assessing or collecting the additional 1% tax imposed under the provisions of PA 1959, No 263, in addition to the taxes imposed by PA 1933, No 167.

No costs, a public question.

BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

BLACK, J. (*concurring*). Mr. Justice Holmes, writing at the time in another politically momentous "great case" (*Northern Securities Co.* v. *United States,* 193 US 197 [24 S Ct 436, 48 L ed 679]), has provided an appropriate introduction to this consequential showdown between an emergency-tagged statute and a restrictive provision of our Constitution. We refer to this writing of more than a half century ago (pp 400, 401):

"Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend. What we have to do in this case is to find the meaning of some not very difficult words. We must try, I have tried, to do it with the same freedom of

natural and spontaneous · interpretation that one would be sure of if the same question arose upon an indictment for a similar act which excited no public attention and was of importance only to a prisoner before the court."

Some recent history is in order. Last winter, and at least until it became too late to submit to the people today's constitutional question, everything debated in this case of Lockwood was seemingly clear throughout the legislative halls of the Capitol. This is evident from the journals of House and Senate, to which reference shall presently be made. No one seems then to have doubted that the people were possessed of right to regard this constitutional tax limitation* as remaining in fully understood effect unless and until, acting at the polls, they should choose to repeal or modify its terms. The limitation prohibits legislation designed to increase the original rate of taxation upon and against what people know for what it really is: the ordinary transaction of purchase and sale, at retail, of tangible personal property. But Michigan's financial crisis grew to alarming proportions. Election day passed without legislative agreement upon any one of the suggested ways of obtaining relief—at the polls—from the limitation. The legislature thereupon decided to and did levy an additional tax of 1% on all such transactions by amendment of the use tax law, not the sales tax law. Its action is shown by PA 1959, No 263. A rather manifest question of constitutional law was thus left for judicial consideration, the legislature not having sought relevant advices of the attorney general and the question having been repeatedly raised on the floor of each house prior to the enactment.

---

* "Provided, That at no time shall the legislature levy a sales tax of more than 3%." (Const 1908, art 10, § 23, as amended in 1954.)

All these events, and the rather obvious consequences of financial difficulty that are due to attend a judicial determination that the new tax collides with the quoted limitation, have in the words of Holmes brought down upon this Court "a kind of hydraulic pressure" which seemingly makes doubtful, in some respected legal minds, that which was so clearly understandable heretofore.

As in the *Northern Securities Case,* what we have now to do is to find the meaning and purpose of some not very difficult words; words appearing in the Constitution—not the statute before us. Once that meaning and purpose is ascertained, the remainder of our task presents but little difficulty. Our judgment then becomes the determination, not of a great case but of a case the decision of which should have been (and must yet be if it is to be decided as the legislature would have it) referred to the people on general election day.

The real question in this case—the decisive question—is not the brilliantly argued yet irrelevant point that there was and is a known difference between sales and use taxes. Of course there is a difference. Legislation hitherto effective in our State makes the distinction clear, and so we tug not at that oar, which at best would turn us around and about in aimless circles. Rather, our task as primary guardians of the Constitution is to determine whether the legislature may—the quoted restriction considered and interpreted—impose the present sales tax levy *and* a use tax levy *upon each transaction of retail sale* without offending this simply written and pointed restriction on the power of taxation of such transactions.

Phrasing the question so—and it seems the only honest way of phrasing it unless we are to shut our eyes to and see not that which all of the people of our State have clearly perceived and understood—,

we find no difficulty in holding that said Act No 263, to the extent shown in Mr. Justice Smith's opinion, collides with and falls before the Constitution.

Mr. Justice Smith has considered and lucidly covered the strict legal phases of the case. But more remains to be said concerning the actual reason for our present disagreement. That we now undertake. We shall also here and there insert a few observations in defense of all constitutional limitations against erosion or defeat by judicial as well as legislative misconception or misunderstanding of settled rules of constitutional law.

### *Why the Divisive Opinions in this Case?*

Prior to the people-initiated amendment of 1939,* judges and justices of Michigan courts of record were nominated and elected as partisan party candidates. The amendment purposefully changed all this, yet by continued inaction of the legislature, members of this Court—even though elected by the nonpartisan "separate judicial ballot"—are still nominated as partisans at partisan party conventions. Naturally, this situation has brought to our Court judicial officers the nomination or successive nominations of whom have been made by different political parties. Until corrected it continues to bring up a subject we would open and dwell upon before it is re-opened after the opinions in this case are handed down.

We divide in this case. Our veteran Brothers adhere to the ways of metaphysical, rather than understandable, interpretation of constitutional restriction upon the legislative power of taxation.

---

* The people-intended design of the 1939 amendment was that of removing the judiciary (of the courts of record of Michigan) from partisan politics. Yet the legislature has been slow—mighty slow for 2 decades now—to effectuate such purpose so far as concerns nominations for the office of Supreme Court justice (See Const 1908, art 7, § 23, as amended).

This they do despite *Bacon's** recent guide to the authoritative view. Manifestly, then, and no matter how devoutly our elders may protest otherwise, and no matter the corresponding protestations of newcomers seated here, these divisive opinions are bound to appear—we say "appear"—to some thoughtful folk as well as the cynics of professional politics as having been induced by considerations other than those of orderly constitutional interpretation. This is not good for the Court and it is not good for society. Hence we feel constrained to record this unusual statement of reasons why 5 of our members find themselves bound to rule as they do.† There must be no misunderstanding of our division.

These words are not addressed to partisans, who will no doubt fulminate despite this message, but are addressed solely to the people, to those whose honest interest is that of appraising our divergent views and ascertaining the real reasons for the divergence.

Whatever the ensuing noisy clamor of politics and the forthcoming arguments of necessity grounded on Michigan's acknowledged financial emergency, we do not consider the one and cannot consider the other. Necessity is the "argument of tyrants, the creed of slaves." Like the fabled judge of the old West, it knows no law. And an emergency can never create legislative power. It may, at best, call into exercise "a living power already enjoyed." (*Home Building & Loan Association* v. *Blaisdell*, 290 US 398, 426 [54 S Ct 231, 78 L ed 413, 88 ALR 1481].) In this case no such power lives. It was slain by the Constitution.

---

* *Bacon* v. *Kent-Ottawa Authority* (October, 1958), 354 Mich 159.

† Our elders fail to perceive that the Constitution must not be interpreted by the ordinary rules and tests we apply to the words of a doubtful statute, a commercial transaction, an ambiguous will, a complex agreement of corporate structure, or a corner notary's draft of deed or land contract.

Our Constitution being the primary object of the present inquiry, we have read and listened throughout the presentation of this case with the historic twin admonitions of Marshall and COOLEY constantly in mind. "We must never forget that it is a Constitution we are expounding;"* we shall not "subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress." (*People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, 506, quoted *post* at greater length.)

Each provision of a State Constitution is the direct word of the people of the State, not that of the scriveners thereof. It is the State's voice of democracy. So, when called upon as we now are to expound the meaning and effect thereof in the instance of a tax controversy, our single concern—our undeviating inquiry—is easily refined to and defined by simple questions. We proceed to ask some of them. What meaning and purpose did the people themselves have in mind when they considered and ratified the provision in question? *What did the people,* having ratified it, *have a right to expect from it in the way of protection from further taxation?* What meaning did the words "naturally convey to the popular mind"? What is the sense, of the words in question, "most obvious to the common understanding at the time of its adoption"? Of the diverse interpre-

---

* "A Constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by, which they may be carried into execution, would partake of a prolixity of a legal code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its' nature, therefore, requires that only its great outlines should be marked, its important objects designated, and the minor ingredients' which compose those objects be deduced from the nature of the objects themselves. * * * In considering this question, then, we· must never forget that it is a Constitution we are expounding." (*M'Culloch* v. *Maryland,* 17 US 316, 407 [4 L ed 576].)

tations that are said to be available to us may we *(No, Brothers, should we?)* select the one "which will defeat rather than effect the constitutional purpose"? And—should we adopt the legalistic construction defendants urge upon us—, what is left to the people excepting the hollow and helpless shell of a completely disemboweled constitutional limitation? If a "foot-in-the-door" additional tax—on purchases and sales at retail—of 1 cent is good, why can't it be 10 cents at the next term of the legislature?

As Mr. Justice SMITH has persuasively demonstrated, questions such as these speak clear answer in favor of supremacy of the Constitution over this 6-weeks-old act of 1959. Doubtless our Brothers would agree with us on that score, could they agree that the simple questions themselves are proper. But, in effect, say they (and here comes the real point of our total disagreement), "the questions are not right; *our* teaching, *our* legal philosophy, *our* settled convictions, lead us to examine the Constitution by other and more technical modes of test, just as we have done in the past, and we listen more to the voice of the legislature than to the voice of the people as we confront a case like this." In opposition we in effect reply: "But *our* teaching, *our* legal philosophy, *our* settled convictions, lead us to examine the Constitution by other precepts for we hear only the voice of the people in determining the construction and applicability of its terms."

If this opinion does no more than to reveal fully and for all to see the actual ground and cause for today's division, it will have served its purpose. Through the *quodlibets* of Mr. Justice CARR the veteran members of this Court have explained their past and present philosophic and legal reasons for approaching decision of this case. The value of their presentation and ours will have to be appraised over the years by society as well as by the profession.

So far as we are concerned there need only be recorded here what surely seems to be, by all respectable authority extant (starting with Chief Justice Marshall's quoted declarations and extending through the great works of Story and Cooley to the solid front of uniform judicial agreement), the right way to undertake solution of a constitutional problem as at bar. Here, then, not in our words but in those of the great writers and scholars of constitutional law, are the plain reasons why we choose to ascertain the people's meaning of their Constitution before we undertake any consideration whatever of the legislation in question.

Mr. Justice Story:

"Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." (1 Story, Constitution [5th ed], § 451, p 345.)

Mr. Justice Cooley:

"Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the

duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power. In these cases we thought we could arrive at it from the public history of the times." (*People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich 499, 506.)

"And in seeking for its real meaning [Const 1850] we must take into consideration the times and circumstances under which the State Constitution was formed—the general spirit of the times and the prevailing sentiments among the people. Every Constitution has a *history* of its own which is likely to be more or less peculiar; and unless interpreted in the light of this *history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it.* This the Court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express." (*People* v. *Harding,* 53 Mich 481, 485.)

Mr. Justice CAMPBELL (Mr. Justice COOLEY concurring) :

"The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind, in all cases where the propriety of such construction is not negatived by some settled rule of law. In all instruments which are submitted for confirmation to the people themselves, and which derive all their validity from a popular vote, such a construction is peculiarly necessary; for otherwise they would be defrauded of the right to frame their own government according to their own will." (*People* v. *Dean,* 14 Mich 406, 417, 418.)

Mr. Justice COOLEY (quoted in *May* v. *Topping,* 65 W Va 656, 660 [64 SE 848]):

"A Constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81*)."

United States supreme court (modern declarations):

"If we remember that 'it is a Constitution we are expounding,' we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose." (*United States* v. *Classic,* 313 US 299, 316 [61 S Ct 1031, 85 L ed 1368].)

"Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." (*United States* v. *South-Eastern Underwriters Asso.,* 322 US 533, 539 [64 S Ct 1162, 88 L ed 1440].)

General text-statements:

"The question in interpreting a Constitution is not so much how it was understood by its framers

---

* Page reference is to volume 1, 6th ed. See 1 Cooley's Constitutional Limitations (8th ed), p 143.

as how it was understood by the people adopting it."
(11 Am Jur, Constitutional Law, § 84, p 707.)

"Words or terms used in a Constitution, being dependent on ratification by the people voting upon it, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in interpreting statutes and acts of the legislature. This gives rise to the universally recognized and incontrovertibly established rule of construction that it is presumed that words appearing in a Constitution have been used according to their plain, natural, and usual signification and import." (11 Am Jur, Constitutional Law, § 65, pp 680, 681.)

We shall now proceed to demonstrate from our decided cases why some of our members undertake constitutional construction with the wrong rules. For illustration let us recall the sad history of judicial evisceration of another tax-limitational provision—the so-called 15-mill amendment.*

That amendment was, when it was adopted by the people, trustingly regarded as having limited to the constitutional rate of 1-1/2% the "total amount of taxes assessed against property in any one year." Yet when the right of protection against "special" assessment was asserted under the amendment, our predecessors seized upon the technical distinction (just as they again do here between *sales* taxes and *use* taxes) between *general* taxes and *special* assessments (*Graham* v. *City of Saginaw,* 317 Mich 427). They then proceeded to tell the people that by their amendment they had succeeded only in protecting themselves from higher *general* taxes; that the amendment did not include "special" assessments within its protective scope, and that the respective legislative bodies of the State remained free to levy,

---

* For such history, see the outline with citations appearing in *Bacon, supra,* commencing on page 164 of report.

without limit and without regard for the constitutional limitation, all kinds of "special" assessments. Thus was a big gouge torn from the intended muscle of the limitation, simply because the Court forgot or overlooked the guide of Marshall and COOLEY.

Now it has always been clear to us that special assessments are "taxes" and that ordinary people by common understanding of their Constitution had an amendment which protected them from additional property taxation, no matter the brand name which any legislative act or judicial decision might stamp on the particular impost or levy against such property. (One's home can be lost just as quickly and finally for nonpayment of "special" assessments as for nonpayment of "general" taxes.)   By the same token, and if the defendants are right in the case before us, an ordinary citizen can be denied the right to purchase groceries or, say, a motor car, should he refuse to pay this 1959 imposed tax on that which he would purchase at retail.

Here, then, is the old game of cat with mouse the defendants would have us play with the people when similar constitutional limitations are before us.   If the Constitution restrict the amount of "taxes" levied against property, we are presumably to tell the complaining taxpayer—"Ah, yes, but these are *special* assessments."   If the Constitution restrict the amount of taxes levied on purchases and sales at retail, we are to say—to the appealing taxpayer— "Sure, you are right, but these are *use* taxes" (and so on).   Thus, by the doctrinaire notions of our Brothers, the people cannot prevail, no matter what they may write into their Constitution for the purpose of limiting the power of taxation, unless, possibly, they go about the task of writing and adopting a limitational provision in the fine print form—with at least as many words—of an insurance policy. This is something Marshall tells us does not belong

in a Constitution. So does our common sense. And there is no need or occasion for it, Marshall's searching analysis considered.

What then is our essential difference of opinion in this case?

Our minority still stands, despite *Bacon's* recent about-face on construction of constitutional tax limitations, just as it did before. From the pre-*Bacon* record of the past, such limitations seem to have been looked upon by them "as great public enemies standing in the way of progress." Indeed our Brothers still appear to regard it the "duty of every good citizen" to give such limitations "a damaging thrust whenever convenient."\*

Our majority, on the other hand, stands for a people's construction of such limitations, a construction which perforce is of greater breadth by the might of popularly understood intention at the time of adoption.

Our view stands for the people's understanding of tax limitations that are created by the people. The other view stands for the legislators' and lawyers' interpretation of a tax limitation created by the people. This is where we part.

And so our good Brothers would in effect say to the legislature: You may with our blessing levy any tax on the transaction of retail sales, in any amount, so long as you call it by some other name than a sales tax and are careful not to levy it by amendment of the sales tax law. Thus may you get around the Constitution. We say to the legislature, on the other hand: Your membership like our own should always inquire (before enacting or approving tax legislation scrutinized under a constitutional tax limitation) what the people by popular understanding

---

\* The quotations are taken from Justice Cooley's opinion in *People, ex rel. Bay City,* v. *State Treasurer,* followed in *Bacon,* both *supra.*

had a right, from the beginning, to expect from the limitation.

In these portentous days of October we are not just deciding this case of Lockwood. We are declaring again, in the same language and according to the identical convictions of 88 years ago, a great principle of constitutional law for the guidance of legislators, governors, judges and lawyers. The people's intent is supreme. When the constitutionality of legislation is challenged here the Constitution is our first line of inquiry. And we obtain the answer when we look to the laws and the usages, and to the popular knowledge thereof as of the time of adoption of the provision in question. Here the popular conception of retail sales taxation, theretofore created by law and painfully ingrained into the people's comprehension by the retail practices of the years leading to adoption of this amendment, must lead "all reasonable minds" to the inevitable conclusion that the legislature has erred in the present instance.

## The Question of Legislative Motive

Defendants rely in their brief to great extent on the established rule that constitutionally questioned legislation comes into court armed with a conclusive presumption of "proper motive" on the part of the legislature. Here again there is no disagreement. We may and do look upon the legislature as consisting of 144 dedicated apostles of the people intent always on ascertaining and carrying out the people's will (in spite of that which appears in the legislative journals)*.

---

* The legislature was not exactly unaware of the well-understood restrictive nature of the limitational proviso, conjoined as it is with other known restrictions contained in the 1954 amendment of section 23. February 5, 1959 house joint resolution "H" was introduced by Representative Warner and others. Such resolution pro-

Sure, all members of the legislature are honorable men. But all that is quite irrelevant to the present problem. The legislature, good intent and all, has made a mistake. We may concede it was an honest one. Doubtless it was partly encouraged to enact the legislation in question by faith and reliance on past decisions of this Court in similar cases, an abrupt halt of which was called in *Bacon.* Such reasoning is fully consistent with that which defendants' counsel themselves point out (by quotation from *People* v. *Gibbs,* 186 Mich 127, 135 [Ann Cas 1917B, 830]):

"Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives."

Upon these premises we may attribute to the legislature the loftiest motives and yet find that it should have pursued one or more of its earlier proposed resolutions to obtain from the people the desired relief; that it should not in lieu thereof have enacted a bill which, if given effect, would amount to a constructive fraud on the right of the people

posed that a redraft of section 23 be submitted. Its thrust was that of obtaining, from the people, direct authority to levy, upon "all persons engaged in the business of making sales at retail, in addition to all other taxes authorized by law, an annual tax for the privilege of engaging in such business equal to 1% of the gross proceeds thereof." February 27, 1959 senate joint resolution "H" was introduced by Senators Nichols, Andrews, Geerlings, Beadle, Minnema, Francis, Graebner, Younger and Lodge. This resolution proposed that section 10 (of article 10) be amended by the people in such way as to authorize borrowing by the State of a sum not to exceed $100,-000,000 and, relevantly here, to authorize the legislature to "levy a sales tax of 1% in addition to and upon the same base as the sales tax authorized by section 23 of this article 10, which additional tax shall expire not later than June 30, 1961." Finally, by house joint resolution "Y", introduced May 14, 1959, it was proposed by Representative O'Brien and another that said section 23 be submitted to the people *for outright repeal.* No one of these resolutions was adopted, and so the people have not been permitted to decide what some members of the legislature wanted—properly—the people to decide.

to decide these grave issues for themselves. Thus the present enactment—conceived as it was of desperation and frustration, chaos and crisis, temper and distemper—was passed while a sort of legislative delirium was running its course. This was "hydraulic pressure" with a vengeance.

We would pursue this point of good motive further. The legislature may have assumed that this Court would continue its inhospitable attitude toward constitutional limitations of tax rates, evidenced by its treatment of the 15-mill amendment during the past 15 years. The Court visibly and admittedly has looked with jaundiced eye on efforts of the people to restrict taxation by constitutional means. So this case is not one for suggestion of "bad motive" on the part of the legislature. Rather, it is one for recognition of that which has been the post-1933 policy of the judicial branch (until the halt was called in *Bacon*) ; for advising the legislature that the present Court turned in *Bacon* from the disproved doctrines Mr. Justice CARR has again written, and that a majority of this Court will, in the future, continue adherence to the rules of constitutional interpretation which this Court followed for more than 60 years, beginning in COOLEY's time. We seek not to change constitutional interpretation but only to return to the hallowed and time-tested doctrine of our great predecessors.

## Conclusion

Even an appellate court judge, living as he must in a measure of social detachment, must on occasion get down to the earthy level where groceries and other necessaries of mortal sustenance are sold and bought at retail, for even judges must eat. Lined. up with his fellow purchasers at the checkout station, Mr. Justice gets the same look—from the point·

of view of people generally—of that which is taking place all over Michigan as millions of retail sales of "tangible personal property" are contracted, concluded and taxed under the asserted aegis of a combination of laws authorizing sales and use taxation. What is that look, from the actual point of view of the queue of buyers as each proceeds in procession to ante up? (Does not the carefully budgeting wife figure in the 4% tax before she goes to the store? Is it not simply that she pays an actual levy of 4% on the transaction of bargain and sale?) The sum of agreed prices of each purchased item is totted up and the checkout operator thereupon presses the "TX" button, which adds an actual tax of 4% to the sum of the buyer's retail purchase. He pays the exacted tax—not 2 separate taxes by fact or common understanding—and gets his receipt showing the aforesaid total plus the machine-calculated tax of 4%. He has—all artful legal syllogism aside —paid what to him and his fellows is no less than a levied sales tax of 4%, a tax which in part has been levied by unconstitutional legislation.

No member of this Court is unaware of the temporary yet dismaying consequences that are due to attend a determination that Act No 263 is invalid, even in part. The prospect is no rosier here than on the legislative and executive floors below. Yet we have no alternative when the people have spoken, clearly and forcefully, by their basic instrument of government by law. The remedy, even though it be slower, lies in another forum; that of submission to and decision by the people themselves. They wrote this proviso into the Constitution. Ours is not to rewrite it, or to interpret its intended purpose in such way as will leave it a puppet of the legislature.

If a judge could have his own way, if his personal predilections might lawfully be brought into play

when the judicial process works upon a limitation as at bar, we doubt not that each of us would prefer to pay more in the way of sales taxation than to assume another and presumably more progressively burdensome mode of taxation. But decisions of such nature, the Constitution considered, are not to be made by judges as judges. They are to be made by the casting of our ballots—as citizens—on general election day. And so we say judges have no right to cast ballots, the effect of which is judicial defeat of a properly adopted constitutional amendment, by means of an opinion or opinions deposited in our clerk's office.

This illusion that from our cloistered heights we are unable to perceive what every citizen knows from his daily experience, namely, that he now is paying— by purpose and administration of this enactment— a tax of 4% instead of 3% on the necessities of life, is still another example of that which Mr. Justice VOELKER has recently dubbed "judicial somnambulism."

---

By the quoted constitutional proviso the people enjoined the legislature, firmly, this way:

You may proceed to levy sales taxes or sin taxes, use taxes or abuse taxes, privilege taxes or personal taxes, special assessments or general assessments, duties, imposts and excises. But you shall not levy, directly or indirectly, taxes on the transaction of retail sales at a rate or sum of rates greater than 3%.

The Supreme Court, too, advises and consents. We advise the legislature in this instance that it has transgressed and that we consent to the enactment of challenged legislation only when it passes muster under the Constitution.

We agree that the writ should issue.

VOELKER, J., concurred with BLACK, J.